MASSEY, *Appellant,* v. YOUNG, *Appellant,* AND LOWE AND KELSO, *Respondents.*

1. **Fraud**: ACTION TO SET ASIDE SHERIFF'S DEED: EVIDENCE. In an action by a defendant in execution against the plaintiff, the plaintiff's attorney and the purchaser at a sale thereunder to set aside the sale and sheriff's deed, on the ground, among other things, of fraud and conspiracy between the defendants in the action. *Held,* that it was error to exclude the execution, the return thereon and the deed.

2. **Sheriff's Sale**: TRANSFER OF BID. A bidder at execution sale may transfer his purchase to another by consent of the latter, and the transferee will then become the recipient of the deed from the sheriff.

3. ———: PURCHASE BY SHERIFF'S CLERK, VIEWED WITH SUSPICION. Although a sheriff's clerk not holding an appointment as deputy, is not forbidden by statute to buy at a sale by the sheriff, yet equity will narrowly watch the actions of a person possessing such opportunities for questionable practices, and if he does buy, will view the transaction as against the policy of the law and pregnant with suspicion of fraud, and if there be indications of unfairness or inadequacy of price or the like, will hold that the purchase is not *bona fide*.

4. **Proof of Fraud.** Fraud is rarely ever susceptible of positive proof. Its vermiculations are chiefly traceable by covered tracks and studious concealments. It is not to be presumed; but anything which satisfies the mind and conscience of its existence is sufficient.

5. **Fraud in Execution Sale Avoids it as to all Parties.** In an action brought by a defendant in execution against the plaintiff, his attorney and the purchaser at the execution sale, to set aside the sale on the ground of fraud, it appeared that the fraud had been perpetrated by the attorney, the purchaser and a third person, and that the defendant and the plaintiff were alike victims of the fraud. *Held,* that the sale must be set aside *in toto*. The purchaser could not be decreed to hold as trustee for the plaintiff.

*Appeal from Franklin Circuit Court.*—HON. A. J. SEAY, Judge.

REVERSED.

This was a suit brought by Jane Massey against Isaac N. Young, Thaddeus A. Lowe and Wm. Kelso. The peti-

tion set forth that plaintiff was the owner of an undivided one-third interest in several tracts of land in Franklin county, fully describing them; that in November, 1872, defendant Young recovered a judgment against plaintiff for $226.82 and costs, on which he caused an execution to be issued, and on the 1st day of November, 1873, had said lands sold under said execution; that there was no competition at said sale, and the property was struck off to defendant Kelso for $47; that her interest was fairly worth $1,000; that the several tracts were valuable for different purposes, some for agriculture and others for their mineral deposits, but this fact was concealed by defendants from the sheriff, and all the tracts were offered and sold in one body; that at the time of the sale and for a long time before and after it plaintiff was in a state of mental and physical infirmity, which wholly incapacitated her from business; that defendants were fully aware of these facts, and conspired and confederated together to cheat and defraud plaintiff out of her property, and to that end caused the sale to be made in a body, and thereby prevented competition, and secured the property at a nominal sum.   The petition prayed that the sale be set aside and for general relief.

To this petition defendant Young filed an answer admitting all its allegations except the charge of fraud and conspiracy.   For further answer in the nature of a cross-bill against his co-defendants, he alleged in substance that the said judgment had been obtained by defendant Lowe as his attorney; that he did not himself at the time reside in Franklin county, and Lowe managed the whole matter for him; that Lowe caused the sale to be made and promised to bid upon the property so as to make it bring the debt; that he had neglected to do so; that plaintiff Massey was insolvent and defendant had thus lost his debt entirely; that Lowe's conduct was prompted by the fraudulent purpose of cheating defendant out of his claim against the plaintiff, and that he had combined and confederated with

defendant Kelso and induced him to take the sheriff's deed in his name for that purpose, and that Kelso was fraudulently holding the property for the joint benefit of himself and Lowe. The cross-bill prayed that Kelso be declared a trustee for Young, and that the title so acquired by him be divested out of him and vested in Young.

Defendants Lowe and Kelso filed a joint answer to the petition denying specially all the allegations thereof. Defendant Lowe also filed an answer to the cross-bill of defendant Young, denying specially all the allegations of the cross-bill, and averring that he had not bid in the property because Young had failed to furnish him with the money to pay the costs, and the purchase could not have been consummated without payment of the costs. Defendant Kelso likewise filed an answer to the cross-bill, denying all fraud, and averring that he did not know that Lowe was Young's attorney until after the sale, and that the purchase was made for his own sole benefit. To these several answers plaintiff filed a reply denying the new matter set up in them. Defendant Young likewise replied denying the allegations of new matter in the answers of Lowe and Kelso to his cross-bill.

At the trial the plaintiff offered in evidence the execution in the case of Young against Massey, under which was made the sale complained of, together with the sheriff's return thereon; also the sheriff's deed. This evidence was offered for the purpose of showing that the land was sold in a body. Defendants Lowe and Kelso objected to the admission of the deed on the ground that it did not show whether the land was sold in a body or in separate tracts, and to the admission of the execution and return on the ground that the latter was no evidence against a purchaser at the sale. These objections were sustained, and the evidence was excluded.

Theron Barnum and John F. Darby testified to plaintiff's mental infirmity.

James Halligan, attorney for defendant Young, testi-

fied that a short time before this suit was brought he and Kelso were talking about Lowe and the sale of the Massey land and the charge Miss Massey was making of frauds between Young and Lowe, when Kelso remarked something like this: That he and Lowe were to divide whatever they made out of the purchase between them; that he had bid for the land honestly and paid his money for it, and, if he lost the land, he thought he would get his money back. In a subsequent conversation Kelso said that the agreement to divide with Lowe was made after the purchase. Some time after this he called witness' attention to the fact that he had made this last remark. This last conversation took place after this suit was brought.

Defendant Young testified: When I learned that Lowe had obtained a judgment for me against Jane Massey, I instructed him in case her interest in her father's real estate was sold to bid it up to the amount of the judgment and costs, and if it should fail to bring so much, to buy it in for me. Lowe disobeyed my instructions and permitted the land to be sold for about $40. I have never received one dollar of my claim. The land was sold in one body. It would have sold to much better advantage separately. The whole of the land was certainly worth at the time of the sale $4,000 or $5,000. Plaintiff's father refused $5,000 for eighty acres of it. This eighty acres was rich in mineral.

E. H. Jeffries testified that the Massey lands were in two tracts about six miles apart; both were rough and broken and almost entirely unfit for cultivation. On one there was some lead. It was said to be fair scrap diggings, value rather prospective than known.

Defendant Lowe testified: I never heard of any mental or physical infirmity of Jane Massey until after I obtained the judgment against her, when I heard Colonel Crews say she was crazy. When the judgment was obtained I notified Young of the fact; don't know who ordered the execution issued; don't think I did; had no money in

my hands to pay costs; he never gave me any and never authorized me to bid on the property for him; don't think I ever had a word with Kelso about the lands before the sale. One or two weeks after the sale I had a conversation with him; didn't know he had bought the lands till he came to me after the sale and told me so. There was, before the sale, no agreement of any kind between Kelso and me in relation to the lands.. Sometime after the sale I agreed to bring a suit for him to partition the lands. I was to have half the proceeds from his share, after deducting his purchase money. I brought the' suit; never had any conversation with Kelso before the sale about Jane Massey.

On cross-examination, witness said: I wrote a good many letters to Young to which I got no answer; tried to find his whereabouts by writing to postmasters in localities where I supposed he might be found or known; don't think I informed Young that execution had issued; didn't know where he was; don't remember that I ever made any promise to protect Young's interest at the sale or buy in the land. I was not present at the sale; had no object in being either present or absent; don't think I knew at the time the exact day on which the sale occurred. It was a matter that didn't concern me; don't think I had agreed to attend the sale; don't know whether I had any communication with Young after the sale or not; had considerable trouble trying to find him; finally found him in Franklin county; he had been there but a short time; he had been living in Douglass county, then in Polk. I knew but little of the pecuniary condition of Jane Massey at the time of the sale; knew of no means to pay the judgment but the land; I was about Union, the county seat, on the day of sale. My office fronted the court house square. I had no special reason not to be at the sale; had no arrangement with anybody to represent me at the sale as attorney for Young or otherwise.

The witness then identified a letter written by himself to Young, February 14th, 1873, in which he wrote: "I

will have an execution issued in your favor against Jane Massey and her interest in the land sold to satisfy it, though her attorneys have given me notice that she was insane at the time of the rendition of the judgment, and that if her interest is sold they will move to set aside the sale on that account; but I will have it sold and buy it in for you, and then you will have to resist their application to set aside."

The witness then identified another letter written by himself to Young, April 16th, 1874, in which he wrote: " Yours of 13th came to hand. I was quite surprised to hear from you at Sullivan, so close to home, when I had been hunting for you so long. What I desired to communicate to you is this: I caused the interest of Jane Massey in Massey's lands in this county to be sold under your judgment. I tried to communicate with you, so as to ascertain if you desired me to buy them in for you, but not being able to hear from you, I had to let the matter go. So at the sale one Wm. Kelso bought her interest at $47, a little less than enough to pay the costs. Therefore Kelso owns Jane Massey's share, and he wants to make partition of the land, or have it sold—and the question is whether yourself and the boys will join as plaintiffs in the partition suit against the Massey heirs, who I understand are in Europe; or I think that Mr. Kelso would sell his claim at reasonable rates, and thinking that you might desire to keep the lands in the family, and, to that end, might wish to buy him out, is the reason for writing to you."

Defendant Kelso testified: I believe I asked Lowe if the title to the land was good, about the time I bought, and I think I asked if the sale was regular and legal, and if the notice of sale was all right. Mr. Lowe was doing business for me as attorney at law about that time. I went to him because I thought he knew about the business; don't think I knew at that time, that he had been attorney for Young; think I found it out a few days afterward; don't remember how long it was after that before I had another conversation with Lowe; had no conversation

with him before the sale; had such a conversation with Halligan as is detailed in his testimony, and had such a contract with Lowe. My impression is I made this contract after the sale. I offered Lowe one-half the proceeds of the sale of my share of the land, after deducting purchase money, or one-half the land I bought, if he would bring a partition suit and attend to the whole business until it was finally disposed of, and he accepted my offer. I took the land at another man's bid. When he wanted me to take it, I asked him if it was all right, and he said it was, and to ask Lowe about it. I asked Lowe, and he said it was all right. I asked about the title, regularity of the sale, notice, etc. The man of whom I took the bid is Stephen Frazee. I think it was the next day after the sale that he wanted me to take the bid off his hands.

On cross-examination, the witness said: I was not at the sale; don't know the land. Frazee told me it was worth more than the money. I don't remember whether I paid it to the sheriff or one of his deputies; if to a deputy, I don't know which. I think, perhaps, Frazee was one; saw him about the sheriff's office. He was in the office when I talked to him about the land. I saw him handle executions; don't know how long he had been there; don't know that he was deputy; saw him attending to business for the sheriff; think Frazee stated some kind of a reason why he wanted me to take the bid off his hands. He said something about Gale, the circuit judge. I think he said that Gale would say he was deputy; don't remember that I paid the money to Frazee; don't remember when I talked to the sheriff about the matter, if at all; think I spoke to Mr. Lowe about the partition suit before I got the deed; I talked with Lowe before I took the land. Frazee has no interest in it now, nor has he had any since I took his bid. I paid the money to him or to the sheriff; gave just the amount of his bid, no more. He told me there were two more interests, and that a partition suit would have to be brought. I have been a deputy sheriff

myself some four or five years, and have been around the court house a good deal; think I saw Lowe before I paid the money.

Stephen Frazee testified : I was at the sale; bid on the land; so did others. The land was sold in six subdivisions. I did not hold any official position in the office of the sheriff at the time of sale ; was in his office as clerk ; signed his name to receipts on his verbal authorization; bid the highest, and all the lands were sold to me ; transferred my bid to Wm. Kelso. When I bought the land I thought I was getting the whole of it. Somehow I found out that Lowe was the attorney of Young, and he told me I had only bought an undivided one-third, and that there would have to be a partition suit to get the benefit of even that part. I had made no inquiry into the matter before the sale ; bought it because I thought something could be made out of it; did not want to get mixed up in the courts in a partition suit; so I offered to transfer my bid to Kelso in order to avoid the trouble, time and expense of a partition suit; think, perhaps, I met Kelso on day of sale, and knowing that Kelso was a man who sometimes bought land, I offered him my bid. He asked me if it was all right. I referred him to Lowe as a man who might know something about it; told him Lowe had been attorney for Young in the suit. When I bid on the property and bought it, I bid and bought for myself exclusively. There was no understanding between myself, Lowe and Kelso as to my purchase.

On cross-examination, the witness said : I don't know that I ever investigated the title of the land; might have asked Mr. Wood about it. The handwriting of the return on the execution is mine, except the signature, which is Sheriff Crowe's. I acted as clerk for Crowe in writing the return. This was part of my business. I staid in the office more than Crowe, hunted up titles to lands, entered levies on executions and did the general business of the office,

but made no seizures of personal property, and did no business required to be done by an officer.

I. N. Inge testified: Jane Massey was rather a singular person; excluded herself from society; was sharp enough to count dollars and cents. I was her father's administrator. I have seen a portion of the land in controversy. It is called mineral land; can't say what was its value at time of sale. It is very rough, and timber is poor.

John T. Crowe, the sheriff, testified: I hold in my hand the sale book containing advertisement, etc., of the Massey sale. The land was sold in six separate tracts. Frazee purchased all. I don't remember whether there were any other bidders present or not. Frazee was clerk in my office, not deputy—worked by the day. He was justice of the peace and asked to have his office in mine. I remember something about the transfer, but don't know whether the deed was made to Frazee or to Kelso; don't remember who was present at the sale. Kelso may have been, and Lowe may have been present; cannot name any body that was present; made no other memorandum at the time of the sale. Don't remember I charged the costs to Lowe. If I did, I think I would remember. Don't think I charged costs to any body. Don't remember whether Wood and O'Shea were present at the sale or not. My best recollection is the money was not paid on day of sale; there was some arrangement about it. It was not a year till the money was paid. I don't say that Kelso paid the money; don't know who got the deed, don't remember getting any instructions from him; if I did, they were verbal; don't remember talking with Kelso; don't remember any particular conversation with Frazee.

At the close of the evidence, by leave of court, the plaintiff amended her petition by striking out the allegation that Kelso bid for the property, and substituting therefor an allegation that the bid was made by Frazee and was afterward by him transferred to Kelso, in consummation of a scheme arranged between Frazee, Lowe and Kelso, and

in fraud of the rights of plaintiff. The court found for defendants Lowe and Kelso and entered a decree dismissing the petition of the plaintiff and the cross-bill of defendant Young. From this decree both the plaintiff and defendant Young appealed.

*T. W. B. Crews* for appellant Massey.

*James Halligan* for appellant Young.

*J. C. Kiskaddon* for respondents.

## I.

SHERWOOD, C. J.—The ruling was erroneous which refused permission to introduce the sheriff's deed to Kelso, and the execution and return thereon. The deed was by law *prima facie* evidence of the recitals it contained. Without its introduction, plaintiff had no standing in court. And the return on the execution was presumptively true as to the statements therein made, even against strangers. *Burgert v. Borchert*, 59 Mo. 80, and cases cited.

## II.

No doubt is entertained that it was competent for Stephen Frazee, the alleged bidder, to transfer his bid to defendant Kelso. By mutual consent the bidder at execution sale may transfer his purchase to another, and such other become the recipient of the deed from the sheriff. Gwynne on Sheriffs, 376; *Jamison v. Tudor*, 3 B. Mon. 357; *Frizzle v. Veach*, 1 Dana 212.

## III.

The heart of this cause lies in two questions: 1st, Whether the machinery of the law was fraudulently used with the purpose of depriving plaintiff of her property, and defendant Young of the benefit of his judgment. 2nd, Whether Kelso was an innocent purchaser.

So far as concerns Frazee, he can lay no claim to that

title.  He never paid a dollar on his purchase; and there are other reasons equally potent as the one just mentioned, for reaching the same conclusion.  He was to all intents and purposes, save in bare name and technical appointment, the deputy of Crowe, the sheriff; for Frazee staid in the office more than Crowe, ; was his clerk; gave receipts for money in Crowe's name; investigated titles to lands; entered levies on execution; did the general office business, and acted as clerk at the sale in question.  Although a purchase by Frazee is not within statutory prohibition, yet equity will narrowly watch actions of a person possessing such opportunities for questionable practices —for collusion and oppression; and consequently, if the clerk of the sheriff buy at the sale of his employer, equity will view such transaction as against the policy of the law; as pregnant with suspicion of fraud, and if there be indication of unfairness or inadequacy of price or the like, will hold that the purchase is not *bona fide*.  The point has been similarly ruled in Kentucky, relative to a purchase of personal property by a deputy sheriff of his co-deputy, though the law did not interdict such purchase.  *Warland v. Kimberlin*, 6 B. Mon. 608.

Here there was gross inadequacy of price.  An undivided one-third interest in 440 acres of land, worth $1,000, was knocked off for $47.  But notice other vestiges of fraud.  Why was Frazee so nervously apprehensive that Gale, the circuit judge, would say that he was "Crowe's deputy?"  It does not appear that the circuit judge had ever ordered any purchase made by Frazee set aside.  Why then did he anticipate such a result in the particular case?  It seems difficult to refer such forebodings to any other cause than a consciousness of wrong committed—a wrong demanding redress.  But the reason given above to Kelso by Frazee, when the latter asked him to take the bid off his hands, was not the reason Frazee gave when on the witness stand, for desiring to make the transfer.  Then it was because he did not "want to get mixed up in the courts

in a partition suit." So that the reason given Kelso in private, by Frazee, for wishing to make the transfer, and the one he gave in public, when a witness, do not co-here. This difficulty is of often occurrence when Truth and its ancient adversary are placed in juxtaposition. Although it was Frazee's customary duty to investigate titles to lands, and enter levies thereof on executions, and although he entered the levy on the execution in question, and wrote out the return thereon at great length and with great particularity, his memory is utterly oblivious as to whether he investigated the title to the particular tracts or not. He says "I don't know that I ever investigated the title to the land; I might have asked Mr. Wood about it." True, and so he might have asked any body else about it, but did he? Such a singular lapse of memory is not calculated to provoke very favorable inferences.

But having devoted, for the present, sufficient attention to Frazee, let me inquire: How stands the case with Kelso? There is, in the first place, no allegation in Kelso's answer of the affirmative defense that he is a *bona fide* purchaser without notice. And if such allegation were not wanting, evidence to support it would be. It is to the last degree doubtful when Kelso paid the money for the land. The sale occurred November 28th, and the deed was not executed to Kelso till December 18th, twenty days thereafter. He says: "I think, perhaps, I paid the money when I got the deed." But he will not say whether he paid the money to Frazee, or to a deputy, or to the sheriff. The latter, however, testifies that his "best recollection is, the money was not paid on the day of sale; there was some arrangement about it. It was not a year till the money was paid." If Kelso did not pay the money until after he received notice of such facts as were calculated to put a reasonably prudent man upon inquiry, the payment came too late to afford him any protection. And there is no lack of such facts in the record. He was the buyer of lands, and was in consequence, presumably familiar with

real estate values, and if so, knew that the property had been sacrificed at the sale. *Eck v. Hatcher*, 58 Mo. *loc. cit.* 239, *et seq.* The clerk and virtual deputy of the sheriff, offers him his bid, one-third of 440 acres of land worth $1,000, for $47; tells him the bid is "all right," that it is worth more than the money, and gives as a reason for offering him the bid, that the circuit judge would set the sale aside if it were known who the real purchaser at the execution sale was. And it was not known till developed at the trial who the actual bidder was. But Kelso was willing, it seems, to assist in practicing a deceit on the circuit judge, and to accept the transfer and its profits, by becoming the ostensible bidder. So, after repeated conversations with Lowe, to whom he was directed by Frazee, for information, and who, he was informed by Frazee at the very outset, had been the attorney of Young in the suit, he consents to the transfer. And so valuable is his purchase, and so great his gain, both actual and prospective, that he can afford to give to Lowe, (whom this record brands as the betrayer of his client's trust,) one-half of what may be realized as the result of the partition suit, which Lowe agreed to and did bring.

I am satisfied from the foregoing facts and others yet to be related, that Kelso had a sufficient understanding of the whole affair before he paid the purchase money. He is told by Frazee that there were two more interests in the land that would have to be bought, and that this would require a partition suit, and he is also told by Frazee to "talk with Lowe." This was evidently after Frazee had talked with Lowe; for from the latter he professes to have gained his information in regard to the interest of the other heirs. And Kelso circuitously and evasively admits that the arrangement to give Lowe half for his services in the partition suit was effected before the purchase money was paid; because he had previously said that he thought, perhaps, he paid the purchase money when he got his deed, and he says also, "I think I spoke to Mr. Lowe about the

partition suit before I got the deed." As he did not obtain the deed till December 18th, and did not pay the money before that time taking his nearest approach to a positive statement as true, it seems certain that the contract with Lowe was concluded prior to paying the purchase money or obtaining the deed.

The whole matter may be summarized thus: Frazee, the sheriff's clerk and *de facto* deputy, buys the land under the hammer of his employer, for a mere pittance. On the same day he "somehow" learns that Young's attorney in the suit is Lowe; talks with him; immediately becomes alarmed at the idea of getting "mixed up in the courts in a partition suit;" is also instantly seized with a sudden fear that "Gale" will set aside the sale and not even allow him thus to "get mixed up." Thus harrassed by two opposing and impending calamities; thus assailed by two conflicting fears, he bestirs himself to escape the approaching peril, by searching for a transferee. Fortune favors his quest, and at a most auspicious moment whom does he meet but Kelso? talks with him; offers him his bid without any advance in price; tells him it is "all right," worth more than the price paid, and refers him to Lowe, as Young's attorney. Kelso talks with Lowe, and after several such talks, the arrangement is effected whereby Frazee is simultaneously relieved of his bid and of his fears, Young of the benefits of his judgment, and Jane Massey of her land! The foregoing circumstances, as well as others of a similar nature disclosed by the record, are sufficient to sustain the charge of *mala fides* against the defendants Lowe and Kelso.

Fraud is rarely ever susceptible of positive proof, for the obvious reason that it does not cry aloud in the streets, nor proclaim its iniquitous purposes from the housetops. Its *vermiculations* are chiefly traceable by " covered tracks and studious concealments." Cooley on Torts, 475 ; *Hopkins v. Sievert,* 58 Mo. 201; *Burgert v. Borchert,* 59 Mo. 80. And though fraud is not to be presumed, yet it is as legiti-

mate to infer its existence from surrounding circumstances pointing unmistakably to a wrongful purpose, as it is to thus infer under similar circumstances the commission of a crime; and this is done daily. Anything, therefore, which satisfies the mind and conscience of the existence of fraud is sufficient. Cooley on Torts, 476, and cases cited.

## IV.

Relative to Young's cross-bill—it is impossible to grant the relief he prays. If the sale, in consequence of the above circumstances, was fraudulent, it should not be permitted to stand; "for what fraud creates, justice will destroy." But the sale will be set aside, and then he will have opportunity to enforce his judgment in the usual way. The judgment will be reversed and the cause remanded, with directions to the circuit court to enter the proper judgment setting aside the execution sale and any deed or deeds based thereon; to properly adjust the costs, and if necessary to have an accounting to the plaintiff. All concur, except RAY, J., not sitting.