## MARGARET D. POCOKE and JOSEPH POCOKE v. E. M. PETERSON, Appellant.

### Division One, April 2, 1914.

1. **EVIDENCE: Compromise: Sale Under Execution: Refusal to Accept Amount of Judgment Debt.** Testimony of a compromise, as such, is not admissible; but where plaintiffs bring suit to set aside a sheriff's deed, and to enjoin the defendant from taking possession thereunder, on the ground that the property was a homestead, evidence that the plaintiffs, on discovering the property had been sold by the sheriff and defendant's attempt to take possession, tendered him the amount of his judgment with interest, costs and attorney's fees, and that he refused the tender, points straight to the fact that defendant is standing on his cold legal right by virtue of his sheriff's deed; and if such evidence had been admitted, a judgment for plaintiffs would not be reversed because of its admission, unless it further appeared that the decree has no other basis in equity.

2. **PLEA IN ABATEMENT: Motion to Set Execution Sale Aside: Suit for Same and Injunction.** The rule that a subsequent suit abates because of a pending suit applies only when the plaintiff is the same person and both are commenced by him. A suit to set aside a sale under execution on the ground that the land was a homestead and to enjoin defendant from taking possession under his sheriff's deed cannot be held to be barred by the fact that in the original suit in which defendant obtained judgment against one of the plaintiffs they filed a motion to set aside the execution sale on the same grounds, the parties not being the same. Besides, the cause of action is not the same in its entirety.

3. ———: ———: ———: **No Notice.** Whether or not a plaintiff is in court in a suit upon a motion to set aside the execution sale thereunder, filed by defendants after the judgment term, until notice is served upon him, is adverted to, but not decided, because the plea of abatement is ruled adversely to him on its merits.

4. **HOMESTEAD: Abandonment: Intention: Removal of Household Goods.** Abandonment, during the life of the housekeeper, is a composite fact, made up of two elements, namely, an intention to abandon and an external act by which the intention is carried into effect. A removal of all or a part of the household goods and a storage or use of them elsewhere, with a present clearly established intention to return to the homestead and in the meantime to rent the property from month to month, is not an abandonment. [Criticising the *dictum* in St. Louis Brew. Assn. v. Howard, 150 Mo. l. c. 451, where it is in effect said that the intention to return cuts no figure in abandonment.]

5. ———: **Sale Under Execution: Equity: Cloud on Title: Threatened Possession.** The householder does not have a complete remedy at law where his homestead has been sold under execution and the purchaser is threatening to take possession under his sheriff's deed; but a suit in equity is available to remove the deed as a cloud upon the title and to restrain the purchaser from taking possession.

6. ———: ——— **Fraud.** Where a homestead, acquired originally without fraud by record title and actual occupancy, and within the statutory value, actually existed when the debt was made, then a gift, a voluntary conveyance or any form of alienation, is of no concern to creditors.

7. ———: ———: **Conveyance to Wife: Paying Existing Lien.** Although the head of a family, directly or indirectly, causes or permits the title to his homestead to be put in his wife without any valuable consideration moving thereto or between them, even though his motive be never so fraudulent, the creditor

cannot complain so long thereafter as the property is actually used as a homestead. If the homestead, within the statutory value without any liens thereon, actually existed at the time the head of the family made the debt for which defendant obtained judgment against him, it is no concern of said defendant that at a foreclosure sale under a deed of trust the husband, as the agent of his wife, bought in the property, and had the trustee by his deed convey it to her, paying to him $300 for the purchase price, and she paying the balance by executing a mortgage thereon to secure notes signed by her and him. Even admitting that the husband took $300 of his own separate money and applied it on the bid at the trustee's sale, he merely took his own funds to pay his own debt to an existing debtor—to extinguish a mortgage on his homestead.

8. ———: **Paying Existing Lien: Preferring Creditors.** Where the homestead is within the statutory value and size, the householder may borrow money to pay an existing mortgage thereon, or use his other money to pay such existing debt, without jeopardizing his homestead. A debtor may prefer a creditor, although the creditor be one who has a mortgage on his homestead.

9. ———: **Sale Under Execution.** An execution sale of a homestead within the statutory value and size, whether mortgaged or not, whether it has been conveyed to the wife with the intention to defraud creditors or not, is void and conveys no title.

Appeal from Buchanan Circuit Court.—*Hon. W. K. Amick*, Judge.

AFFIRMED.

*Broaddus & Crow* for appellant.

(1) It is undisputed that Pocoke purchased this property subject to a deed of trust and afterwards borrowed money from various persons, giving deeds of trust to secure same; the property was sold under the first deed of trust for $1565, which was the exact amount of money due on notes secured by deeds of trust on the property and at that time the title to the property passed out of Joseph Pocoke and Mrs. Pocoke became the purchaser thereof at the sum of $1565,

her husband borrowing $1250 as a part of the purchase price and paying the balance, so that Mrs. Pocoke did not in fact invest five cents in this property, her husband having borrowed $1250 and paid the balance of the purchase price out of his own funds, so that clearly Mrs. Pocoke holds the property in trust for the benefit of Pocoke and even if he had been occupying it from August 1, 1910, the date of recording the deed, until levied upon, he could not have claimed homestead right in the property because the debt due appellant by Joseph Pocoke was contracted on the 1st day of July, 1910, and the sale on execution conveyed good title to appellant and the court therefore erred in excluding the sheriff's deed. R. S. 1909, sec. 6711; Bank v. Fry, 216 Mo. 24; Scharff v. McGaugh, 205 Mo. 344; Jones v. Hogan, 135 Mo. App. 347; Adams v. Gosson, 228 Mo. 566. (2) In any event the interest in the real estate represented by the sum of $315 paid by Mr. Pocoke on the purchase price of the real estate is subject to execution, as Mrs. Pocoke is certainly trustee for the benefit of her husband to that extent. Joseph Pocoke lost all homestead rights in the real estate in controversy on the day of the sale and the fact that he purchased the real estate at the sale and caused the title to be placed in his wife, does not give him a homestead right in the property as against appellant. The evidence of occupancy by the Pocokes of the property in controversy prior to August 1, 1910, therefore was clearly erroneous. Pearman v. McKee, 79 Mo. App. 210; Casebolt v. Donaldson, 67 Mo. 308; Elstroth v. Young, 83 Mo. App. 253. (3) Under the allegations of this petition respondents had a complete and adequate remedy at law for the reason that if the property sold was the homestead of respondent the deed is absolutely void and would have been no bar in ejectment. Jewell v. Boardman, 181 Mo. 647; Buffington v. Corty, 195 Mo. 490. (4) Under all the evidence in this case the court should have found that

there was no intention on the part of the parties to occupy the real estate in controversy as a homestead and clearly they were not occupying it at the time the execution was levied. Finnegan v. Pundeville, 83 Mo. 517; St. Louis B. Co. v. Howard, 150 Mo. 445. (5) The court clearly erred in permitting respondents to prosecute the present action while the motion in the original case of Peterson v. Pocoke was still pending and undetermined. Michelin T. Co. v. Webb, 143 Mo. App. 679; Graham v. Lee, 69 Mo. 339.

*George W. Groves* and *O. W. Watkins* for respondents.

(1) Creditors cannot look to exempt property for the payment of their debts. Moore v. Wilkerson, 169 Mo. 334; Chance v. Jennings, 159 Mo. 544; Banking Co. v. Brown, 165 Mo. 32; Hoselton v. Hoselton, 166 Mo. 182. The sale by the sheriff in this case was void and conveyed no title. Creech v. Childers, 156 Mo. 338. (2) A conveyance of a homestead, direct or indirect, from husband to wife, even without consideration, is good, and the husband and wife have all the rights of homestead in the property. Moore v. Wilkerson, 169 Mo. 334; Davis v. Land, 88 Mo. 436; Bank v. Guthrey, 127 Mo. 189; Kendall v. Power, 96 Mo. 142; Holland v. Kreider, 86 Mo. 59; Bank v. Brown, 165 Mo. 32. (3) It is immaterial whether in redeeming from trustee's sale Pocoke took the title in the name of himself or that of his wife. Spratt v. Early, 169 Mo. 357. Mrs. Pocoke had a right to claim a homestead in this lot. Sharp v. Stewart, 185 Mo. 518. The purpose of the homestead law is to protect the wife and children, if any, and not the husband alone. Meyer Bros. v. Bybee, 179 Mo. 354. (4) If the title to the homestead is in either husband or wife, they have a right to keep it free and clear of their liabilities except as against such liens as they may voluntarily

place thereon. Peake v. Cameron, 102 Mo. 568; Macke v. Byrd, 131 Mo. 691; Ratliff v. Graves, 132 Mo. 76. The right of homestead was not lost by reason of executing deeds of trust. Worley v. Hicks, 161 Mo. 340; Burton v. Look, 162 Mo. 502. (5) There was no abandonment of the homestead. Bank v. Brown, 165 Mo. 32; Lawson v. Hammond, 119 Mo. App. 480; Rose v. Smith, 167 Mo. 81. There being no such thing in law as a fraudulent conveyance of an exempt homestead, and abandonment not having been pleaded, the question of abandonment cannot be considered in this case. Bently v. Blake, 153 Mo. 675; Bank v. Brown, 165 Mo. 32.

LAMM, J.—From a decree in plaintiff's favor in the Buchanan Circuit Court, cancelling a sale on execution and a sheriff's deed of real estate on such sale, with ancillary injunctive relief, defendant appeals. Questions here are of a scope seeking both pleadings and facts. Attend to them.

Plaintiffs married in January, 1909, and sue as husband and wife on the eleventh day of July, 1911, by a bill in equity alleging, in substance, thus: At times mentioned they occupied lot thirteen in block twelve in Brookdale addition to the city of St. Joseph as a homestead, said lot being less than eighteen square rods of ground and not to exceed $3000 in value, encumbered by deed of trust liens. Subsequently, while such homestead existed, defendant obtained a judgment against them for fifty dollars, on which execution issued and was levied on said lot; that a sheriff's sale was made thereunder on advertisement, and defendant thereat was the purchaser, on a bid of ten dollars, on July 7, 1911, obtaining a sheriff's deed therefor; that plaintiffs had filed their deed for record prior to the time the debt was contracted which was merged in defendant's judgment; that the sheriff, failing to apprise plaintiffs of their right to hold the prop-

erty as exempt from execution and of their exemption rights under sections 2179, 2180, and 2183, Revised Statutes 1909; failed to have the property appraised; that neither defendant nor the sheriff notified plaintiffs of their right to claim said property under the homestead laws of the State, and that by reason of the premises the levy of said execution was void, etc.; that defendant, under his execution purchase, now claims to own the lot and denies to plaintiffs their exemption and homestead rights; that he is threatening to take forcible possession under his deed and is about to do so. The bill also alleges equitable grounds for the interference of equity by injunction against his taking possession, and against his setting up or claiming any right, title or interest in the lot. The bill next sets up grounds for relief by adjudging and quieting title under former section 650, now section 2535, Revised Statutes 1909, and to that end avers that plaintiffs are the owners of the lot and that defendant claims some right, title or interest, etc. The prayer was for a decree determining title, and setting aside the sheriff's deed and sale, and for an injunction.

A temporary injunction issued, we infer, on that prayer.

To that bill defendant answered, denying all its allegations and further by way of affirmative matter, that the plaintiff, Joseph, on the sixth day of July, 1910, purchased said real estate in the name of his wife under foreclosure of a deed of trust; that the debt for which defendant secured judgment on which execution issued, followed by the levy, sale and sheriff's deed, was contracted prior thereto. It is charged, moreover, that Joseph's said purchase in the name of his wife was for the purpose of defrauding existing creditors and that he did not acquire a homestead by that purchase; that plaintiffs filed a motion on July 10, 1911, "in the original cause," stating the same facts now in their bill in the instant case, which mo-

tion is still pending and undisposed of and by reason thereof the court "has no power or jurisdiction to adjudicate the issues while the other cause is pending."

To that answer plaintiffs replied denying its allegations.

Presently defendant filed a motion to dissolve and the cause was tried on that motion and the merits.

The facts follow, to-wit:

The lot has a fifty-foot front and a back run of 120 feet. There is an old frame six-room house on it, not modern, and the value of the premises was less than $3000. The case may proceed on the assumption that neither the extent nor value of the ground prevents it from being a homestead in a city of the size of St. Joseph, to-wit, one of over 40,000 souls. [R. S. 1909, sec. 6704.]

For several years prior to 1909 plaintiff Joseph, a single man, owned the lot by a title of record. As said, in January, 1909, he married his coplaintiff, Margaret D., and at once commenced keeping house in said residence. There is no dispute but what from that time the Pocokes actually lived on the property as a homestead until the second or fifth day of May, 1911. It is contended by defendant and denied by plaintiffs that the homestead was abandoned at the date last mentioned. The record in that behalf will be set forth presently.

Going back a little, at the time of the Pocokes' marriage, the property was encumbered by two deeds of trust for borrowed money. Presently after the marriage another deed of trust was put on it for a like purpose. At a certain time the debt secured by one of these three deeds of trust was paid off and satisfied of record, so that on July 5, 1910, two of them remained unsatisfied. The notes secured by them were all owned by one beneficiary. The interest being in default, said beneficiary procured the trustee to foreclose and on that day (July 5, 1910) the trustee knocked

down the property to the wife, Margaret D. Pocoke, at such foreclosure sale on her bid (made through her husband) at a sum sufficient to satisfy the liens of both deeds of trust, together with the cost and expense of the sale, to-wit, $1565 in all. On that bid plaintiff, Joseph, out of his own means, paid $300, and his wife, the bidder, through him as her agent, secured a loan on the lot from an outsider for the balance of the bid. The proceeds of that loan (one made by the wife and husband) plus the amount paid in by the husband paid the bid, and on July 6, 1910, the trustee made a deed to Margaret D. The record shows that it took several days to complete the transaction, that the deed was delivered on such consummation and was filed for record on August 1, 1910. The testimony indicates that the property was bid in in the name of the wife to preserve a home for her free from the vicissitudes of fortune. It further indicates that in 1910 the Pocokes had fallen into financial distress, and that, on a date not disclosed by the record, the plaintiff, Margaret D., took the benefit of the bankrupt act.

(Note: In their brief counsel for defendant state that Mrs. Pocoke was declared a bankrupt in July, 1910, but we see no record evidence of that. Nor is it material since Mrs. Pocoke claims nothing by reason of a discharge in bankruptcy.)

Again going back a little to pick up another thread, it seems that on July 1, 1910, four or five days prior to said mortgage foreclosure, plaintiff Joseph became indebted to defendant for a commission on a real estate deal. Denying liability, he was sued in a justice court and on September 17, 1910, say ten weeks after the mortgage foreclosure, defendant obtained a judgment against him for fifty dollars. On that day in that cause he took an appeal to the circuit court and his wife, coplaintiff, Margaret D., signed his appeal bond so that it was on that date and not before that Margaret assumed a relation of debtor to defendant.

Six or seven months later, in April, 1911, on a trial in the circuit court on that appeal, judgment was rendered against Joseph for the debt and against his wife on the appeal bond for fifty dollars and costs. On June 12, 1911, execution issued against both on that judgment. On the same day on that execution the sheriff levied in the lot and on July 7, 1911, he sold it under the hammer to defendant on his bid of ten dollars, and executed a sheriff's deed. The execution defendants or neither of them (plaintiffs here) had any actual notice of the issue of the execution, its levy on the lot, the advertisement under it or the sale until after the sheriff's deed was executed. Neither the sheriff nor defendant Peterson made any attempt to comply with the homestead or exemption statutes by apprising the owners of their exemption rights or by appraisal of the property or by setting off a homestead.

Defendant Peterson did not testify in the instant case. There was testimony indicating that he had attempted to get possession of the property, harbored a design to that end and would have acomplished it if it had not been for the institution of this suit. In the face of his failure to deny that testimony, it may be assumed that he was about to take possession without resorting to the law on the strength of his sheriff's deed and a claim of ownership to the exclusion of plaintiffs' rights, if any.

In this connection there was testimony offered by the Pocokes to the effect that on their discovery of the sheriff's sale and deed and when the controversy over the possession arose, they tendered defendant the amount of his judgment with all interest, costs and attorney's fees, which offer he refused to accept. The court, on defendant's objection, excluded this testimony. In passing we observe that while testimony of a compromise, as such, was not admissible, yet a refusal to accept full satisfaction of his claim points with

an unerring finger straight to the fact that he was standing on the bare letter of his cold legal rights by virtue of his sheriff's sale and deed, rather than on any equities in his favor. If the chancellor had allowed the testimony to go in, as illustrative of that fact, we would not have reversed his decree in favor of the Pocokes because of error in that behalf materially affecting the merits unless it had further appeared that his decree had no other basis in equity.

One of the contentions of Peterson is that the homestead, if any, was abandoned. Going back a little for the facts upon which that contention hinges, they are, to-wit: Joseph Pocoke was a travelling man, handling a line of goods as a salesman. Early in the year 1911, while he and his wife were "keeping house" and living in the property, as they had been since their marriage, his business as salesman called him away from St. Joseph for a week at a time—sometimes more, sometimes less. While things were in this fix, in February, 1911, Mrs. Pocoke's mother fell sick and Mrs. Pocoke went to her home in the city of St. Joseph to minister to her in her affliction, locked up her own house in the emergency and left it as it was. We cannot make out whether Joseph, during the five or six weeks of his mother-in-law's sickness, slept in his own or in his mother-in-law's house on his trip returns, but we take it as immaterial on the question of abandonment. Presently, Mrs. Pocoke, relieved as her mother's nurse, returned to her own home and from thence up to the early part of May, 1911, the Pocokes resided there. The things we are now about to relate are those, as we understand it, on which Mr. Peterson bases his contention of abandonment, viz.: It seems Mrs. Pocoke, as an experiment, concluded to go "on the road" with her husband and carry a side line of ladies' garments to test out the question whether by their joint efforts as salespeople they could not recoup their fortunes sufficiently

to pay debts then so pressing on them as to put them in hard lines. Their home was in St. Joseph and there is not a particle of testimony they intended to remove their residence from that city, or that they harbored the intention to acquire a new homestead or permanently give up keeping house in their old home. It is all *contra*. The plan contemplated was precisely the one that Mr. Pocoke had been following theretofore, to-wit, trips of a few days out, possibly a week, now and then two, over their sales territory and then a return to St. Joseph to be presently followed by a like trip, and so on and so on. The question was what they would do with their home while this experiment was in making. We infer their tentative plan was to lock it up between trips and return to it at the end of each trip as Joseph had done previously. But the mother-in-law persuaded the wife that it was not safe to leave her things in the house and both of them go away from the city for a week at a time. She offered, while they were trying out the plan, to let them have a room to store their goods for pay and a room in which to stay over night on their returns from such trips. This plan being adopted, early in May, 1911, say the second or fifth, they took to their mother-in-law's house in St. Joseph nearly all their furniture and stored it with her. They took a room there and occupied it at the end of each trip—a room partly furnished by them and partly by the mother. They left in their own house some of their personal belongings, a telephone, bicycle, carpets, window shades, coal and wood, and there is not a particle of substantial evidence they permanently abandoned it as a home or did not intend to return there to live presently. The arrangement was a temporary one. The affair of the wife's going on the road with her husband was a mere experiment to be soon tested out and, whether it succeeded or not, it was their plan to return to their own home after the "busy season" was over. There

is testimony that they refused to give a long lease on
it, but were willing to rent it from month to month if
they had succeeded in getting a suitable tenant, which
latter thing never happened. After they learned of de-
fendant's sale under execution in July, 1911, one or
both of them resumed sleeping at their home on com-
ing in from their trips. We think the foregoing states
the facts on the question of abandonment for appel-
lant Peterson as favorable as the record will allow.

One thing more. On June 10, 1911, plaintiffs
here, one day before the bill in the instant case was
filed, filed in the original case of Peterson v. Pocoke
(the one in which the judgment was rendered on which
Peterson's sheriff's deed was based) a motion to set
the sale aside. This is the motion referred to in de-
fendant's answer in the instant case and claimed
therein to be operative to oust jurisdiction. The fact
does not appear one way or the other on the record
whether this motion was filed during term time or af-
ter the term had elapsed at which the sale was made.
Its caption runs: "In the circuit court of Buchanan
county," mentioning no term. Nor is there anything
in the record to show that it was filed by the permis-
sion of the court or in open court or that the original
case of Peterson v. Pocoke was still pending. The mo-
tion was offered in evidence by defendant in the in-
stant case and the bare offer shows that it was "filed
June 10, 1911, by the clerk of this court in case number
20,786," which number was the number of the former
case of Peterson v. Pocoke. There is nothing to show
that Peterson was notified of that motion or that the
original cause was redocketed or that the motion was
docketed by leave or that any entry was made in re-
gard to it by the court. On plaintiffs' objection the
motion was not admitted in evidence and defendant
saved an exception. The motion set up a homestead
claim of exemption from levy and sale under an exe-

cution, averring that the lot described was a homestead; that it had been sold under execution without notice to defendants, to-wit, Joseph Pocoke and M. D. Pocoke, and without any appraisement and without setting off a homestead, etc. The movents described themselves as "defendants." The motion winds up with the assertion that "affidavit, oral and record evidence will be offered on the hearing of this motion."

If any further record facts be essential to material questions raised, they will appear further on in due course.

The court overruled the motion to dissolve the temporary injunction and, as said, decreed for plaintiffs.

We are of opinion that decree stands for affirmance, because:

(a) *Of the motion in the original case to set the sale aside.*

It is argued for appellant that when respondents, one day before they instituted the instant case, filed the motion in question with the clerk (entitled in the original case of Peterson v. Pocoke, in which case Joseph Pocoke was defendant and Margaret D. Pocoke was not strictly a defendant but was insofar forth a party through her suretyship on the justice appeal bond that judgment could go against her for any amount found due at the trial anew in the circuit court, R. S. 1909, sec. 7589) the mere filing of that motion constituted another and prior pending action between the same parties for the same cause in this State, hence a plea of the pendency of that motion was a good plea in abatement. [R. S. 1909, sec. 1800; *ibid.*, sec. 1804.] We do not agree to that. The reason of the law is the life of the law. Now, the reason of the law in that behalf is its abhorrence to a multiplicity of actions. The subsequent suit is abated because it is deemed unnecessary and hence vexatious and oppressive, the maxim being that no one ought to be twice

vexed for one and the same cause; but the rule only applies when the plaintiff in both suits is the same person and both are commenced by himself. It does not apply to cases where there are cross-suits by a plaintiff in one who is defendant in the other. In such cases as that it cannot be said that either is prosecuting two actions against the other within the rule. [Rodney v. Gibbs, 184 Mo. 1. c. 10; Long v. Coal and Iron Co., 233 Mo. 1. c. 734-5.] The plaintiffs in the instant case filed their motion with the clerk in the original case as parties defendant, here they prosecute as plaintiffs. This fact took them outside the rule as announced in the Rodney and Long cases.

Besides that (and closer home) the cause of action was not the same in its entirety. The relief sought in the equity suit is broader and deeper going than could have been granted or was asked on the motion, and the elements constitutive of the whole cause of action in equity differ in essential respects from that in the motion.

The point is disallowed to appellant and in leaving it we make this further observation, viz.: While we have ruled on its merits, yet we reserve the question whether after a judgment term, as here, Peterson was in court on that motion without *notice* and whether, because of that fact, there was any action pending at all. "It is a cardinal principle, that whenever a party's rights are to be affected by a summary proceeding, on motion in a court, that party should be notified, in order that he may appear for his own protection." [George v. Middough, 62 Mo. 1. c. 551.] Notice (when not an express) is an implied necessity in due process. [State ex rel. v. Walbridge, 119 Mo. 1. c. 394 et seq.] Our code provides a scheme for giving notice. [R. S. 1909, sec. 1788 et seq.] Let the question be reserved to be ruled in some case breaking on it.

(b)  *Abandonment of the homestead.*

It is argued for appellant that the homestead was abandoned.  But assuming for present purposes that a homestead once existed, we do not agree that the facts show abandonment.  We are concerned in this case with the question of abandonment while the homestead is an exemption right, i. e., during the life of the housekeeper or the head of the family, and not with abandonment after the homestead became a vested right in a widow and minor children, which has an essentially different quality.  Abandonment, as we are dealing with it, is a composite fact, one element visible, the other sounding in intention, motive.  It is a fact made up of an intention to abandon and the external act by which the intention is carried into effect.  These two elements must conjoin and operate together or, in the very nature of things, there can be no abandonment.  [Strother v. Barrow, 246 Mo. 1. c. 250 et seq.; Hickman v. Link, 116 Mo. 123.]

As the instant case is in equity, the light of a guiding principle may be profitably hung out to direct us to the right goal, viz., "It is a rule of equity as old as its establishment that courts of equity look to the substance and not to the shadow, look to the right and not to the form any transaction may have taken." [Rose v. Smith, 167 Mo. 1. c. 87.]

To intend to rent a homestead from month to month during a temporary absence does not constitute abandonment where the present intention to return. exists.  So, a temporary absence for social purposes, or because of sickness or business distress or for experimental business or school purposes, with no present intention to acquire a homestead elsewhere, does not constitute abandonment in the eye of the law.  A removal of all or part of the household goods and a storage or use of them elsewhere with a present clearly established intention to presently return to the homestead, is not an abandonment.  Abandonment

of a homestead has been held not to exist in cases where the facts in judgment, relied on as tending to show abandonment, were much more emphatic in time and character than in the case at bar.   Without swelling this opinion by an attempt to analyze them, or by quoting from them, we rule that under the doctrine of such cases (to-wit, those cited infra) and the general principles heretofore announced, there was no abandonment on this record, which pronouncement the curious may verify by reading with discriminating diligence:   Bealey v. Blake, 153 Mo. 1. c. 674 et seq.; Duffey v. Willis, 99 Mo. 132; Spratt v. Early, 169 Mo. 1. c. 369; Seilert v. McAnally, 223 Mo. 1. c. 517; New Madrid Banking Co. v. Brown, 165 Mo. 1. c. 35 et seq.

There is some language in St. Louis Brew. Ass'n v. Howard, 150 Mo. 1. c. 451, to the effect that the intention to return cuts no figure in abandonment.   It is there said that it is "a visible occupancy of the premises as the head of a family at the time of the levy of a writ which fixes the homestead rights of the defendant. . . .   There is no other way in which it can be made to appear beyond cavil, question or possibility of fraud on creditors than by actual, visible occupancy."   Besides being unnecessary to the case in judgment, that language is unhandsomely and unhappily narrow and sour as a rule of homestead law. Strictly speaking, by the *letter* of that pronouncement, the head of a family would lose his homestead if at the instant of an execution or attachment levy he was absent over night or had gone on a visit, or was absent under any stress without a particle of intention to stay away or abandon his homestead, *contra* with an abiding *animus revertendi* strong upon him. If that were the law a homestead right would hang dangling on a weak, a slender thread indeed. To those the law holds in professed tender regard, to-wit, the homeless ones who are encouraged to get homes and keep them, it would be a Barmecide feast elaborately spread with os-

tentation but with nothing to it worth while. It would be a reproach to the law. That *dictum*, taken literally and standing alone, is opposed to the whole philosophy, and the harmonious trend of the doctrines of the cases cited supra, and is in the very face of a cardinal rule steadily applied in construing homestead exemptions, to-wit, that from highest reasons of public policy and social justice homestead laws are favored by courts and are always to be construed with liberality to further their benign purpose in creating self-reliant home-owners, rooted to the soil. They exist for the benefit of homestead debtors, not of creditors. [Balance v. Gordon, 247 Mo. l. c. 124 (where many cases are cited.)] .

The learned judge who let fall the language quoted, himself refused to follow that *dictum* and ruled otherwise in subsequent cases (e. g., in New Madrid Bank. Co. v. Brown, 165 Mo. l. c. 36 et seq. and in Bealey v. Blake, 153 Mo. l. c. 674 et seq.). He held finely to liberal views on homestead laws as his writings verify (*vide,* his dissent in Keene v. Wyatt, 160 Mo. l. c. 9 et seq.). What he said in the Howard case must be read with the facts. in that case, and the whole trend of his discourse. [State ex rel. v. St. Louis, 241 Mo. l. c. 238 et seq.]

(c)   *Of a complete remedy at law.*

It is argued for appellant that plaintiffs must be cast because they have a complete remedy at law. Observe, this argument travels on a dangerous theory to appellant, to-wit, the theory, as of course, that if a homestead right existed at the time of the levy and sale, then, on the very face of the record, the sale was invalid and the deed passed no title; hence, there was no call to seek an equitable remedy against the sale and deed, but if plaintiffs were disturbed in their possessory rights, ejectment would be available to them. Undoubtedly a doctrine exists springing from Aristotle's definition of equity, to-wit, the correction of that

wherein the law by reason of its universality is deficient, to the effect that where there is a plain, complete and present remedy at law equity will not lend her aid. But that doctrine is not applied where the life of the bill is to remove a hurtful cloud upon a land title; for equity has *exclusive* jurisdiction in that behalf; nor is it applied to defeat a proceeding in equity to clear up a title where the "defect is such as to require legal acumen to discover it, whether it appears on the deed or proceeding or is to be proved *aliunde.*" [Jewett v. Boardman, 181 Mo. l. c. 656 et seq.; Bank v. Evans, 51 Mo. l. c. 345.]

Moreover, to oust jurisdiction in equity the remedy at law must be so complete that it attains the full end and justice of the case, reaching the whole mischief and securing the whole right of the party in a perfect manner at the present time and in the future. [Hanson v. Neal, 215 Mo. l. c. 279 et seq.] Under that rule there is lack of substance in appellant's contention. Must these plaintiffs surrender possession to Peterson in order to have a chance to turn about and test out their right at law to possession and title by ejectment? Must they lie by supinely and await a suit by Peterson? Must the cloud of an illegal sale and an invalid deed remain as a clog on their title to the stagnation or alienation and to the depression of the value of their property till *he* moves? Must a cloud remain on one's homestead to subserve the by-ends of speculators who fatten on lurking shadows and defects in land titles and are loth to have them cured or removed? It would be lame and halting equity that could not reach such situation with a remedy.

We rule the point against appellant.

(d) *Was there a homestead (and herein of fraud)?*

(1) Taking the question of abandonment as already decided, there can be no doubt about the exist-

ence of a homestead. Long prior to the existence of defendant's debt, Pocoke married, became the head of a family and established his home on the property in question, then owned by him by a title of record. The testimony shows that in both dimensions and value it was a homestead if there had been no mortgage liens upon it whatever. The whole lot, to its full value, was exempt from levy of executions or attachments, liens or no liens. The existence of those liens, therefore, is unimportant so far as a homestead right is concerned. To diminish the liens increased the homestead's value. To satisfy them left the homestead intact and worth still more.

(2) It is argued, however, that there is such fraud shown as invalidates the homestead. We cannot agree to that. Fraud, to be actionable, must result in injury. Assuming the existence of a homestead, as here, acquired originally without fraud, as here, then a gift, a voluntary conveyance or any form of alienation of the homestead (call it *fraud* if you will) is not a particle of concern to creditors. This is so because the homestead is so far forth forbidden fruit to the creditor that he may not pluck or eat thereof, hence it is as nothing to him—hence, *Ex nihilo nihil fit*. Accordingly it has been ruled over and over again that although the head of a family directly or indirectly causes or permits the title to his homestead to be put in his wife without any valuable consideration moving thereto or between them (let his motive be ever so fraudulent), yet so long thereafter as the property is actually used as a homestead, the creditor cannot complain that the title was put in the wife. The "fraud" does not injure the creditor. Accordingly it is further held that an execution sale of the homestead under the circumstances we are dealing with is void and conveys no title. [R. S. 1909, sec. 6704; Bank v. Guthrey, 127 Mo. 189; Kendall v. Powers, 96 Mo. 142; Kessner v. Phil-

lips, 189 Mo. 1. c. 530; New Madrid Banking Co. v. Brown, 165 Mo. 1. c. 38; Rose v. Smith, 167 Mo. 1. c. 86; Spratt v. Early, 169 Mo. 1. c. 370; Vogler v. Montgomery, 54 Mo. 577 (a leading case).]

Let it be conceded to appellant, then, as the most favorable view possible to him, that the transaction by means of which Mrs. Pocoke acquired title was merely colorable, yet, in that view of it, in the law's eye it left the homestead all the while the same homestead it had been before (Kendall v. Powers, 96 Mo. 1. c. 145, and cases supra), no more and no less.

Appellant's learned counsel with animation made the claim at our bar that Mrs. Pocoke did the grievous wrong of "taking the benefit of the bankrupt act to become a holding company" for the homestead title. Why she went to that trouble when the homestead holds *sans* bankruptcy and *sans* any artificial receptacle we do not know. But be it so, that fact could not affect the merits an iota.

It is argued Pocoke paid $300 out of his own pockets on the bid at the trustee's sale and that such fact is of stubborn significance against a homestead right. We do not agree to that view of it. Looking to substance instead of form, as we must, thereby Pocoke merely took his own funds to pay his own debt to his existing creditor. Surely if A owes B, C and D he may pay B without just complaint from C or D.

Nor would it do to hold that if the head of a family borrow money on his homestead he may not repay it without thereby putting his homestead in jeopardy. Homesteads are not held by any such precarious title —*contra,* homestead owners live, move and have their being under the protection of the general laws of the land whereby they may run in debt (when they can) and pay (when they can) without let or hindrance. Were the law otherwise a home-owner with a mortgage would be in bitter hard lines. He would lose his

home to the mortgagee if he didn't pay and lose it to his creditors at large if he did pay. To him, then, the only safe rule would be: Once in debt, always in debt.

The judgment was right. Let it be affirmed. So it is ordered. All concur, except *Bond, J.*, not sitting.