FARMERS BANK OF HIGGINSVILLE, Appellant, v. ROSS M. HANDLY ET AL.—9 S. W. (2d) 880.

Division One, July 10, 1928.

*Lyons & Ristine* for appellant.

756

*Aull & Aull* and *Nick M. Bradley* for respondents.

SEDDON, C.—Suit in equity, commenced on September 19, 1924, in the Circuit Court of Lafayette County, to set aside two deeds, conveying title to approximately 325 acres of farming land situate in Lafayette County, Missouri, upon the alleged ground that said deeds or conveyances were made without consideration and for the purpose of hindering, delaying, or defrauding the plaintiff bank, which is, and was at the time said conveyances were made, a general and unsecured creditor of defendants, Ross M. Handly and Myra E. Handly, husband and wife, who are the grantors of one of said conveyances, in the collection of plaintiff's lawful demands against said defendants. The defendants, other than said Ross M. Handly and Myra E. Handly, are James A. Greer, who is an uncle of said Myra E. Handly, John T. Littlejohn and his wife, Mary L. Littlejohn, E. N. Johnson, and Connecticut Mutual Life Insurance Company, a corporation, the last two-named defendants being, respectively, the trustee and the beneficiary of an unsatisfied and existing deed of trust, which is an encumbrance of record against a part of the land in controversy. The venue of the action was changed to the Circuit Court of Ray County, where trial of the action resulted in a decree and judgment, finding the issues in favor of the defendants, ordering the dismissal of plaintiff's bill, or petition, for want of equity, and taxing the costs against plaintiff. After unsuccessfully moving for a new trial of the action, plaintiff was allowed an appeal to this court from the decree *nisi*.

The petition alleges, in substance, that defendant Ross M. Handly had been a customer of plaintiff bank and had become indebted to plaintiff for money loaned to him upon his various promissory notes, which notes were subsequently reduced to judgment; that, on November 10, 1923, plaintiff obtained a judgment against defendant Ross M. Handly, in the Circuit Court of Lafayette County, for $4554.51, and on June 12, 1924, plaintiff obtained a judgment against defendants Ross M. Handly and Myra E. Handly, in the Circuit Court of Lafayette County, for $3143.90; that executions in aid of said judgments have been returned unsatisfied; that, at the time defendant Ross M. Handly became indebted to plaintiff, he was the owner in fee simple, and in possession, of the 325 acres of land in controversy, together with certain live stock and growing crops thereon: that the real estate in question was encumbered with certain deeds of trust: that, on October 5, 1923, after plaintiff had instituted suit against defendant Ross M. Handly, to recover said in-

debtedness, said Handly and defendant James A. Greer conspired together to cheat and defraud plaintiff, and said Handly, with the purpose and intent to hinder, delay, or defraud plaintiff and other creditors of said Handly of their lawful claims and demands, made, executed and delivered to defendant James A. Greer, a certain warranty deed, for a false and pretended consideration of one dollar and other consideration, but in fact without any consideration, purporting to convey all of the land in controversy to said defendant James A. Greer; that defendant Greer was fully cognizant, at the time of such conveyance, of the fraudulent purpose and intent of said Handly; that said defendant Greer, on October 29, 1923, executed and delivered a pretended deed purporting to convey a part of the land in controversy to defendants John T. Littlejohn and Mary L. Littlejohn, husband and wife, for a pretended consideration; that defendants Littlejohn knew that the conveyance from Ross M. Handly to James A. Greer was fraudulent and void and without consideration, and participated in said fraud and accepted the deed of conveyance from James A. Greer to them with knowledge of its fraudulent taint and character; wherefore, plaintiff prays that said deeds and conveyances be adjudged to be fraudulent and void as against plaintiff; that the same be set aside and for naught held; and that plaintiff have a lien on said real property for its claims and demands aforesaid, and that the said real property be ordered to be sold for the satisfaction of its said demands and judgments against defendants, Ross M. Handly and Myra E. Handly.

Defendants Ross M. Handly, Myra E. Handly and James A. Greer filed a joint answer, admitting the indebtedness of Ross M. Handly to plaintiff, but denying that the sale and conveyance of said land to James A. Greer was without consideration, and the answer avers that said Greer paid, in consideration of the sale and conveyance of said real estate, the sum of $45,000, and that said sale and conveyance was a bona-fide transaction and was made after said Greer and said Handly had offered to sell said land to plaintiff for the same amount, and upon the proposal that, if the said land be worth more than said sum, plaintiff might collect its claim and demand therefrom. The answer denies that defendants Greer and Handly combined and conspired together to cheat and defraud plaintiff, or for the purpose and with the intent to hinder, delay, or defraud the creditors of said Handly.

Defendants John T. Littlejohn and Mary L. Littlejohn filed a joint answer, denying generally the averments of the petition, and alleging the payment of a fair price and consideration of $23,150 for 159½ acres of land in controversy, purchased by them from James A. Greer, and that said purchase and payment was made in good

faith and for value, without notice of any fraudulent intention on the part of their co-defendants, and without notice, or knowledge, of any fact which would put them on inquiry.

The answer of defendants E. N. Johnson and Connecticut Mutual Life Insurance Company is a general denial. The reply is a general and special denial of the averments of the separate answers of defendants Handly, Greer and Littlejohn.

The evidence tends to show that defendant Ross M. Handly had been a customer of plaintiff bank for several years prior to the year 1923, and, during such period of time, he had borrowed from plaintiff bank various sums of money, in evidence of which loans Ross M. Handly had executed and delivered to the plaintiff his several promissory notes. In the early part of 1923, he was indebted to plaintiff bank for loans evidenced by his several promissory notes, as follows: one note for $1300, one for $200, one for $100, one for $3200, and one note for $1000, the latter note being secured by a chattel mortgage on certain live stock, which chattel mortgage, at Handly's request (according to the testimony of the cashier of plaintiff bank) plaintiff had not filed for record. The first three notes aforementioned, aggregating $1600, appear to have been paid by Ross M. Handly in June, 1923, and were cancelled by plaintiff bank and delivered to said Handly. Defendant Ross M. Handly then owned two farms, about a quarter of a mile apart, both situate in Lafayette County. One of said farms comprised approximately 166.18 acres, located in Section 18, Township 48, Range 25, and is referred to in the record as the "home place" of said defendant. It is improved with a six-room residence house, a barn and several outbuildings, and is well watered by two springs. The said farm constituted the homestead of defendant Handly, his wife and their five minor children. The other farm comprised 159½ acres, located in Sections 7 and 8, Township 48, Range 25, and there were no buildings, or improvements, thereon. In 1923, there were growing crops on both of said farms. In addition to the two farms aforesaid, defendant Ross M. Handly was the owner of certain personal property, consisting of agricultural implements, live stock, and about 500 bushels of corn in the crib.

The two farms aforesaid, constituting the land here in controversy, were encumbered with two deeds of trust, as follows: a first deed of trust, dated March 4, 1919, and filed for record on March 22, 1919, executed by Ross M. Handly and Myra E. Handly, his wife, to secure the payment of their principal indebtedness of $25,000, due and payable on March 4, 1924, with interest thereon at six per cent per annum, payable on March 4 of each year; and a second deed of trust, dated April 15, 1919, and filed for record on December 8, 1919,

executed by Ross M. Handly and Myra E. Handly, his wife, to secure the payment of their three principal promissory notes aggregating $12,000, all payable to the order of plaintiff, Farmers Bank of Higginsville, as follows: one note for $8000, payable on April 15, 1920, and two notes for $2000 each, payable on or before April 15, 1922. One of the $2000 notes secured by said second deed of trust was paid by the defendants Handly prior to the year 1923. The $8000 note secured by said second deed of trust was sold, assigned and transferred for value by plaintiff bank on August 8, 1922, to defendant John T. Littlejohn, who held said note, as assignee and owner thereof, until its payment on or about October 29, 1923. The other $2000 note secured by said second deed of trust was sold, assigned and transferred for value by plaintiff bank on May 16, 1919, to one H. C. Thee, who held said note, as assignee and owner thereof, until its payment on or about October 29, 1923. During all the times herein mentioned, both Littlejohn and Thee were directors of plaintiff bank. On July 25, 1923, defendants Ross M. Handly and Myra E. Handly, his wife, executed and delivered a third deed of trust upon said land, which was filed for record on July 27, 1923, in favor of the administrators of the estate of William A. Greer, deceased, as beneficiaries, to secure the payment of an indebtedness of $7000 claimed to be owing by defendant Ross M. Handly to said estate. William A. Greer was the father of defendant Myra E. Handly, and was a brother of defendant James A. Greer, and died during the month of May. 1923. The evidence tends to show that William A. Greer had borrowed $7000 from plaintiff bank for, and on behalf of, his son-in-law, Ross M. Handly, and William A. Greer had delivered to plaintiff bank his own note therefor in that amount. The plaintiff bank presented said note for $7000 as a demand against the estate of William A. Greer, deceased, and the bank was paid upon said demand concurrently with the execution by Ross M. Handly and his wife of the third deed of trust aforesaid against the land in controversy, given to secure and reimburse the said estate for the payment of the William A. Greer note for $7000 in favor of the bank, which had been proved against the William A. Greer estate.

On September 13, 1923, plaintiff bank instituted a suit against Ross M. Handly, as sole defendant, in the Circuit Court of Lafayette County, returnable to the October term, 1923, of said court, to recover upon his two certain promissory notes owned by said bank and aggregating $4200, which suit resulted in a judgment, entered on November 10, 1923, in favor of plaintiff and against defendant Ross M. Handly for the recovery of $4554.51. A general execution issued upon said judgment and was returned *nulla bona* on January 30, 1924. On May 5, 1924, plaintiff bank, as assignee and owner of

a promissory note for $3000, dated August 29, 1921, payable six months after date, executed by Ross M. Handly and Myra E. Handly, his wife, in favor of Anna H. Handly, instituted a suit for recovery upon said note against said Ross M. Handly and Myra E. Handly, as co-defendants, in the Circuit Court of Lafayette County, and judgment was entered therein in favor of plaintiff bank and against said defendants, Ross M. Handly and Myra E. Handly, on June 12, 1924, for $3143.90, which judgment is unsatisfied.

On July 21, 1923, defendant Ross M. Handly executed and delivered to defendant James A. Greer, a chattel mortgage upon certain live stock, agricultural implements, and growing and severed crops, all located upon the land in controversy, to secure the payment of Ross M. Handly's promissory note of the same date for $6000, payable ten months after date, to the order of said James A. Greer. The said chattel mortgage was filed for record on July 23, 1923.

On October 5, 1923, defendants Ross M. Handly and Myra E. Handly, his wife, as grantors, executed and delivered a warranty deed to defendant James A. Greer, as grantee, for a consideration expressed in said deed of "one dollar and other consideration," conveying all of the 325 acres of land here in controversy, together with "all crops now growing, being or standing on the above described land." The said deed recites: "As part of the consideration grantee assumes and agrees to pay all notes now secured by deeds of trust recorded against said land." The said warranty deed was filed for record on October 5, 1923.

On October 29, 1923, defendant James A. Greer, as grantor, executed and delivered a warranty deed to defendants John T. Littlejohn and Mary L. Littlejohn, husband and wife, as grantees, for a consideration expressed in said deed of $23,150 in cash, conveying 159½ acres of land in controversy, located in Sections 7 and 8, Township 48, Range 25, in Lafayette County. The said deed was filed for record on October 29, 1923.

The instant action in equity is brought by plaintiff bank to set aside the two last-mentioned warranty deeds or conveyances, dated, respectively, October 5, and October 29, 1923, as having been made without consideration and for the purpose of hindering, delaying, or defrauding plaintiff bank in the collection of its lawful demands aforesaid against defendants Ross M. Handly and Myra E. Handly.

The first and third deeds of trust against the land in controversy were both satisfied of record on November 1, 1923, and the second deed of trust against the said land was satisfied of record on October 29, 1923, and the several notes secured by said three deeds of trust

were produced and cancelled by the Recorder of Deeds of Lafayette County concurrently with the satisfaction of said deeds of trust.

On November 8, 1923, James A. Greer executed and delivered a deed of trust, conveying to defendant E. N. Johnson, trustee for defendant Connecticut Mutual Life Insurance Company, 166.18 acres of land in Section 18, Township 48, Range 25, known as the "home place" of defendants Handly, in trust to secure the payment of said Greer's promissory note for $9000, payable to the order of said insurance company five years after date.

Other instruments or conveyances of title in evidence, not directly affecting, however, the land in controversy, but conveying title to other lands not involved herein, are, respectively, a deed of trust, dated July 25, 1923, and filed for record on July 27, 1923, executed by Ross M. Handly and Myra Handly, his wife, in favor of Peoples National Bank of Warrensburg, Missouri, conveying the undivided one-sixth interest of Myra Handly, as an heir of her deceased father, William A. Greer, in certain lands situate in Lafayette and Johnson counties, to secure to said bank the payment of a promissory note of Handly and wife of the same date for $7000, which deed of trust was satisfied of record on June 2, 1924, by Alex Greer (a brother of Myra E. Handly and the administrator of the William A. Greer estate), as assignee of said note; and a warranty deed, dated May 14, 1924, executed by Myra E. Handly and Ross M. Handly, her husband, as grantors, conveying to Hatcher Long (a brother-in-law of Myra E. Handly), as grantee, an undivided one-sixth interest in the same land for an expressed consideration in the deed of $6000. The foregoing constitutes the documentary evidence in the record before us.

The evidence tends to show that the annual interest of $1500 upon the $25,000 indebtedness of defendants Handly, secured by first deed of trust upon the land in controversy, fell due on March 4, 1923, and the defendants Handly were unable to make the interest payment. Defendant Ross M. Handly testified at the trial: "Q. Now, Mr. Handly, how did you happen to sell this land? A. Well, they was going to foreclose me, the people that held the first mortgage of $25,000, and I tried to get—I didn't have the interest. I couldn't pay the interest in March, 1923, I believe it was due. $1500 on this $25,000. Might have been a few dollars over. I don't remember, but there was $1500 on it. I went to see the parties that were agents for the people that held this $25,000 mortgage, the 4th of March when it come due, and told them I didn't have the money to pay it, but I thought I could have it by July, and they gave me an extension of time until July, and when the time come around I didn't have the money yet, and I went to see them again and they had got notice

from these parties—I was dealing with Mr. Lee Wallace of the Lexington Savings Bank, I think it was. He was the agent, as I understand, for the people that held this $25,000 mortgage, and he told me that he had received a letter from the parties and that they were going to foreclose if I didn't put this interest up in four or five days, I think. I don't know just what the specified time was, but just a short time. Well, I went back to the Farmers Bank of Higginsville—plaintiff here—and I told Mr. Woestemeyer, the cashier, my condition; that they were threatening foreclosure and I didn't have the money to pay them their interest, and asked him if I could get the money from him and he said, Well, that they would rather not, they had loaned up and they had all—they didn't feel like loaning me any more money. He suggested that the banks over at Warrensburg were in better condition, he thought, and that probably I could get it over there, or suggested to me that I go to see my wife's uncle, Jim Greer. He says, 'I understand he's in right good shape and probably you can get the money from him for a while.' Well, I went to see Mr. Greer and he wouldn't let me have the money at first. I already owed him some money, and he said he didn't feel like letting me have any more money. I owed him about $4000. So I come back and I seen Mr. Littlejohn and I asked him how about some money, and he wanted to know if I couldn't make some arrangements with Jimmy Greer, if I couldn't see him. I told him I had seen him once, and he told me to go back, and asked me to go and see my uncle, Ed Handly, or go back and see Jimmy Greer to see if I couldn't get him to do something, or let me have the money, and I went back and seen him the second time, and he told me that he would pay this interest on the $25,000 mortgage if I would give him a mortgage on my crop and my personal stuff around there to cover what I already owed him and this interest that he had to put up. It was my intention to try to hold my farm a little while to see if I couldn't dispose of part of it or all of it, and that was the reason I wanted to pay this interest on this first mortgage so they wouldn't foreclose me. . . . And so after Mr. Greer had let me have the money to pay this interest, I decided that I would try to sell the land, and I didn't see any chance of selling it or things getting any better, so I later decided that I would sell it, if I could, for what mortgages there was against the land. I went to Mr. Greer and asked him if he would take this land for what there was against it. I think there was around $42,000. There was a first mortgage of $25,000, and then there was another for $8000, I believe, and a note for $2000 besides that, which was $10,000, and a third for $7000. That third was a mortgage that I gave to W. A. Greer estate to secure a note that W. A. Greer held against

me at his death. Q. Did you owe him that note? A. Yes, I owed him $7000. Q. Well, go ahead, then, and relate further, if you can, why you sold this land to Greer. A. Well, I had tried to sell it to other parties and couldn't sell it, couldn't get no offer on it, and I saw that I wasn't going to be able to pay the interest on it another year, and I thought that was the best thing for me to do. I sold it to Greer. Q. What were the negotiations that you had with Mr. Greer, the contract and the terms of it? A. Well, I asked him to take this farm over and pay all mortgages and interest that was held against it. That's about all. I sold it to him that way. Q. Did you have any intention in this transaction with Mr. Greer, when you sold him this land, of defrauding or injuring the plaintiff bank in this case in any way? A. No, sir; no. I have never been able to sell it. I was very well satisfied to get it off my hands, subject to the mortgages." Cross-examination: "Q. Mr. Handly, you tell the court that you were satisfied to get that land off your hands subject to the mortgages? A. Yes, sir, rather than hold it myself and pay interest. Q. And when did you come to that conclusion? Was that in July, 1923? A. Well, I don't know. I had been kinda in that mind for quite a while. I had been trying to sell the land. I don't know just when I come to that conclusion, as far as that goes. Q. As a matter of fact, didn't you come to that conclusion after the bank had threatened to sue you on the notes that you owed the bank? A. I don't know. I had been to the bank and tried to sell them the land before, before I went to see Jimmy Greer. Q. You got several letters in regard to the indebtedness you owed the bank, prior to the time that suit was filed, didn't you? A. I don't know whether I got letters before the suit was filed or not. I got letters from you gentlemen. Q. Well, it was about those notes, wasn't it? A. I believe so. Q. And it was prior to the time when suit was filed? A. I don't remember. Q. Did you come in to see us about them after you got those letters? A. I don't remember that I did. Q. Did you go in to see the bank after you got those letters? A. I don't remember that I did; no, sir. Q. But you did convey all of your real estate to James A. Greer after that, didn't you? A. Well, I conveyed it to him. I don't know when it was, whether it was before I got the letters or afterwards. Q. You know you conveyed all of this real estate to James A. Greer after suit was filed and after you got those letters? A. No, I don't know that. Q. Papers were served on you, weren't they? A. Yes, sir. Q. Served on you in September of 1923, weren't they? A. I believe so, maybe, I don't remember. Q. You know that was before you conveyed your real estate to Mr. Greer, don't you? A. Yes, I believe it was. I don't know just when I made that con-

768

veyance. . . . Q. Have you got any real estate now? A. No, sir. Q. Have you got any personal property now out of which an execution could be collected? A. No, sir, I think not."

Plaintiff read in evidence, as an admission against interest, parts of a deposition of Ross M. Handly taken before the trial, as follows: "Q. You state that you had talked or spoken to Mr. Greer about what you owed to other people before you made the deed on October 5. 1923? A. Yes, sir. I told him about some of the debts. Q. When did you talk with him? A. Well, around about the time I made this deed, I think. Q. How long—before the deed or after the deed was made? A. Before we made the deed. Q. Did you tell him about owing the two notes to the Farmers Bank at that time? A. Yes. He already knew that. Q. Did you tell him about the note that you owed your father-in-law's estate, Mr. William Greer? A. Yes, sir. Q. And he knew about the $25,000 deed of trust on your place? A. Yes, sir. Q. He also knew about the deed of trust to Mr. Littlejohn and Mr. Thee? A. Yes, sir. Q. In fact, then, Mr. Greer knew your financial condition at the time he gave you the check in August, 1923, to pay the interest? A. Yes, sir. just about. Q. Wasn't that about the time you told him what your financial condition was? A. Yes. sir. . . . Q. You were at Mr. Aull's office at the time this deed was made to Mr. Greer on October 5, 1923? A. I believe so. Q. And Mr. Aull took your acknowledgment to that deed, didn't he? A. Yes, sir. Q. Did you tell Mr. Aull what you owed at that time? A. I don't remember whether I did or not. Q. Did you give him the petition that had been served on you in the case of the Farmers Bank of Higginsville? A. Yes, sir. Q. He had that at the time he took this deed from you to Mr. Greer on October 5, 1923? A. That is the suit— Q. That is the suit had been filed in September? A. I don't know. I suppose. Q. Mr. Aull is your lawyer? A. Yes. sir. Q. You told him about this suit of the Farmers Bank, and he knew it and Mr. Greer knew it at the time the deed was made? A. Yes. sir. . . . Q. What price did you value the land at, at the time you turned it over to Mr. Greer? A. Well, I know about what was against it, I didn't put— Q. Did you put a valuation on it by the acre? A. I told him he could take it for what was against it. Q. And he was to pay all the debts? A. All against the land. . . . Q. When you deeded this land to Mr. Greer, then, he was to assume the $25,000 and the two notes, $8000 and $2000, to Littlejohn and Thee, and the $7000 to your father-in-law's estate? A. Yes, sir. Q. That was all that he was to pay and assume for the 323, or whatever it was, acres of land that you deeded to him? A. Yes, sir. . . . Q. Mr. Handly, do you know why you did not mention, in the warranty deed that you gave Mr. Greer, the exact amount

that you were turning this land over to him for? Do you know why? Why you did not mention that in the consideration of the deed? A. Well, I thought selling subject to the mortgages was sufficient. Q. That is the reason that you did not mention it? A. Yes, sir. Q. Did Mr. Greer promise to pay you back anything that he received for the land over and above the mortgages? A. No, sir. . . . Q. You do owe this money to the Farmers Bank and have nothing to pay it with? A. Yes, sir. Q. And you turned over all your personal property to Mr. Greer? A. Yes, sir.''

Defendant James A. Greer testified on his own behalf, as follows: ''Q. You bought this Handly land in question? A. Yes, sir. Q. What were your relations with the Handlys and the buying of this land before you bought it, in connection with the indebtedness against it, or interest, or anything? Commence in your own way and tell the court. A. Well, Handly owed me $4000, a note, and came to me and wanted me to advance the interest on this $25,000 loan, and I told him that he owed me and I didn't see no use of putting more in, I wanted that. He said if he could sell maybe he could pay it, do the best he could, and wanted me to let him have that, and I refused him, and I said I couldn't put up any more money without security, and he went away and came back in a few days and said that he would give me a mortgage on the growing crop and the corn and stock that he had if I would let him have it. Q. Give a mortgage for what? A. Some cattle and hogs. Q. I mean for what? A. For the $4000 and the interest on the $4000, and the interest on the $25,000. Q. What did that amount to? A. The interest on the $4000 and the interest on the $25,000 amounted to $2000. When I figured it up, that left the note $4000 and added the $2000 to it, made $6000 note. Q. What was the $2000 be added to it? A. It was the interest on the $25,000 and the interest on the $4000 up to date. Q. Did you take a mortgage? A. Yes, I took a mortgage. I asked him what he had and he gave me a list and I told him then I would take a mortgage for the $4000 and make it a $6000. . . . Q. Did you examine the records to see whether or not it was clear? A. Well, I gave him a check, or had the bank to send a check over to the Lexington Bank, and I asked if this stuff was mortgaged and he said that it wasn't; so I says, 'I will go over there and, if this stuff is mortgaged, I will stop the check, I won't give it if this ain't clear,' and he said, 'It is clear;' and I went and had Mr. Aull to look it up. I was over at Lexington, and he looked it up, and there was nothing against this stuff that we could find. Q. That is the personal stuff? A. Yes. Q. Did you give a check for the interest on the $25,000? A. Yes, sir. Q. Have you got the check? A. Yes, $1547.79. That is the check (Exhibit G) given

for the interest on the $25,000. Q. What led to your negotiations for the farm? A. Well, after I had paid this interest, I bought the mortgage, the $25,000 mortgage. Q. Why did you buy that? A. Well, they wanted to sell it and I bought that to hold it on the place, you know. . I bought that—I don't remember—a short time after I paid this interest. Q. What did you pay for that? A. I paid $26,000 up to November 1st. . . . Q. Did you pay any interest on the first mortgage? A. Yes. Q. How much, leaving out that $1500 now? A. I paid $625 that date right there (August 4, 1923), with that check (Exhibit H). Q. When did you buy it (the $25,000 note)? A. I bought this note sometime, I reckon it must have been in the latter part of July or first of August. . . . Q. Why did you buy this land? A. Well, I bought it to protect myself and the Greer heirs. Q. What do you mean by the Greer heirs? A. W. A. Greer estate. Q. How are they interested? A. They had a $7000 third mortgage. Q. What, in your opinion, was this farm worth at the time you bought it, the whole farm? A. Well, I judge somewhere between $44,000 and $45,000. I don't know just exactly the figures. That's the way I figured it up at the time and I didn't think it was worth any more because I wouldn't pay the interest on the $7000 (third deed of trust). Q. Now, I'll ask you whether or not you had a conversation with the cashier of the plaintiff bank sometime in July or August? A. Yes, sir. Q. In the presence of Alex Greer, in which you told him, and insisted that he take over the land at what was against it, including this $7000 to the Greer heirs, and make his, if possible, out of the balance, or words to that effect? Did you have that conversation? A. Yes, I did, and Mr. Woestemeyer (cashier of plaintiff bank)—I told him I thought Mr. Littlejohn would take part of it, and he said he wasn't in the land business, he was in the banking business." Cross-examination: "Q. You knew that Mr. Handly owed the Farmers Bank? A. I don't know at that time. When I first paid this interest I don't know whether I did or not, but I knew there was some afterwards. Q. When did you first learn that Mr. Handly owed the Farmers Bank some unsecured notes? A. Sometime after I bought this mortgage. Q. How long was it before you agreed to take the land over from Mr. Handly for the debts against it? How long before that did you ascertain that he owed the bank, or was it before that? A. I didn't know he owed the bank myself at that time, but afterwards I had heard he owed it. Q. When you agreed to take it over from Ross Handly. you didn't know that Ross owed the bank at that time, is that correct? A. Yes, I didn't know. Q. And you learned about that indebtedness after you agreed to take the land off of Ross Handly's hands? A. Yes. Q. And you say that your first talk

with Ross was about a week or ten days before the deal was closed? A. That's what I think it was, because I went to Mr. Handly and I went to Mr. Woestemeyer to get them to buy it and they wouldn't. I told Mr. Woestemeyer I thought Mr. Littlejohn would buy part of it, and he refused. He wouldn't buy it; he could have it for what there was against it, as Ross offered it to me. Q. How did you happen to learn about this indebtedness that Ross Handly owed the bank? You say you learned it after you agreed to buy it? A. I don't remember that. I heard it afterwards. Q. You are sure, now, that you heard it after you agreed to take the land? A. Yes, the first I heard it that I remember of. Q. That was before the deed was made, wasn't it? A. Yes. . . . Q. When was it you were in the bank trying to get the bank to buy this land? A. That was before ever I bought the land. Q. That was before you bought it from Handly? A. Yes. Q. Didn't you know that Handly owed the bank at that time? A. He never said nothing to me about it. Q. And you didn't know at the time you were trying to get the bank to buy the land that Handly didn't owe the bank? A. I knowed it, but I didn't know how much it was. They had called me up to know whether Handly had told me. I says, 'No.' They said they wanted to know if Handly told me he had a mortgage. I said, 'He told me you didn't have any mortgage on the hogs.' Q. Are you talking about the mortgage on the personal property or the real estate transaction? A. That is, I was talking about the personal property. Q. Right after Handly gave you a mortgage on the personal property, Mr. Woestemeyer called you up and said they had a mortgage on the hogs? A. Yes, asked me if Handly told me, and I said he told me he did not. Q. Did you do anything to pay the bank on that mortgage? A. No, I didn't owe the bank anything. Q. You did ascertain they held a mortgage on the hogs and that Handly had given you a mortgage on the hogs also? A. I never saw no mortgage on the hogs. It wasn't of record. Q. Mr. Woestemeyer called you up and told you he had a mortgage on the hogs? A. That was after I had looked at the record and I told him the record didn't show it. Q. When you took that chattel mortgage, you had your attorney to look up the records to see if there was anything recorded against the personal property? A. I did, yes, sir.''

Plaintiff read in evidence, as an admission against interest, parts of a deposition of defendant James A. Greer, taken before the trial, as follows: ''Q. When did you and Mr. Handly first talk trade in reference to this 323 acre farm? A. Well, I don't remember just exactly. . . . Q. Was that before or after he had been sued by the Farmers Bank? A. Before. Q. Do you remember when it was he was sued by the Farmers Bank, Mr. Greer? A. No, I don't. Q. You remember him telling you about when? A. No. Q. Did

you know what he owed the Farmers Bank? A. Not exactly. Q. How much did you know? You say not exactly. What do you mean by that? A. I knew that he owed them. Q. When was it Mr. Woestemeyer told you that Ross owed the Farmers Bank? A. A short time after I paid this interest on this thing over there. Q. When was it you paid the interest? A. I can't tell you that. Q. About when? A. In July. . . . Q. Did you pay Mr. Handly any money when he made this deed? A. One dollar. Q. Where were you when you paid him this one dollar? A. I don't remember now. Q. In Mr. Aull's office? A. I don't know. Q. Did you figure out Mr. Handly owed the Farmers Bank at the time you took this deed? A. No, sir. Q. They had told you what he owed the bank? A. No, sir. Q. You had been in the bank and discussed this matter? A. I know they said that he owed them. Q. You knew that he owed the bank $3000 or $4000? A. Yes, sir. Q. You knew when he deeded you this property that he would not have a dollar left? A. I didn't see where he would. Q. You permitted him to make the deed when you knew he was trying to cheat and defraud this creditor? You knew they would have no way to get their money? A. I wanted to secure this of mine and I bought this— Q. You knew he didn't have a dollar left? A. No. How did I know? I didn't know where it was at. Q. He gave you a mortgage on all this stuff— A. I didn't want to fool with it. I didn't want it, but I told him if he would give me a mortgage I would take it, and he said it was not mortgaged. I said, if this is mortgaged, I will stop the check. Q. What stuff is that? A. His stuff, his hogs and cattle and machinery. Q. You took a mortgage on everything he had. That is the $6000 mortgage? A. Yes, sir. . . . Q. Did you have any understanding with Mr. Handly that you would help him out? A. No, sir. Q. You knew he had been sued, that he was sued upon October 8th? A. I didn't know he had been sued. Q. Didn't you state that the Farmers Bank—A. After they brought it—but I didn't know until later. Q. You knew Mr. Aull was his lawyer in that suit? A. Yes, sir. Q. Didn't he have the petition in that suit at the time— A. This deed was made before that. Q. Made October 5th? A. Yes. Q. You are sure it was October 5th? A. That was my understanding. If he was sued then, I didn't know it. Had no knowledge of it. Q. Didn't he tell you he had been sued—are you sure about that? A. Yes, sir. If he was, I didn't know it. Q. And none of the directors of the bank had told you that he had been sued? A. No, sir. Q. Did you go over and look at the records and see what was on the place, examine the records? A. Mr. Aull did. Q. Your counsel? A. Yes, sir. Q. And that was Mr. Handly's counsel, too? A. I suppose. Q. And that was the only examination made? A. Yes,

sir. Q. And he reported that he had examined the records and he never told you there was anything except the deeds of trust against it? Never told you that Mr. Handly was sued by the Farmers Bank? A. I never knew he was sued. . . . Q. Did you have Mr. Aull look it up when you took the deed? A. There was another fellow there when I made the deed to Littlejohn. Q. Mr. Aull took the acknowledgment to Handly's deed? A. I think so. Q. You state that Mr. Aull went over, and don't you know that Mr. Aull told you about the suit pending in the circuit court? A. No, sir. Q. Don't you know that Mr. Handly told you? A. No, sir. Q. You don't remember it, but Mr. Aull might have told you and you could have forgotten about it? A. I don't think so. . . . Q. And nobody looked up the record at that time? A. I suppose they did. If anybody did, it was Mr. Aull. Q. Don't you know that Mr. Aull looked it up and told you there was a deed of trust against it and also the suit pending in the circuit court by the Farmers Bank of Higginsville against Mr. Handly? A. Not to me. Q. Well, now, let me refresh your memory. Didn't Mr. Handly tell you about the Farmers Bank suing him before you and he came up here? A. Not that I have any recollection about. . . . Q. Did you ever state to Mr. Woestemeyer, or any of the other directors of the bank, that you were going to help Mr. Handly pay this debt? A. Never did. Q. Did you authorize Mr. Aull, your counsel, to offer a settlement and compromise this debt? A. No. Q. Did you ever talk to Mr. Aull or Mr. Bradley about compromising this debt? A. No, sir. I had nothing to compromise. Q. You had gotten all the property and left the bank without a dollar. A. I was not in the banking business. Mr. Woestemeyer said he was in the banking business— Q. Said who was? A. Said that he was. He had a chance to buy it. Q. What did you offer it to him for? A. That was before. Q. You mean that was before you bought it? A. Yes, sir. Q. Where were you? A. In the bank in that little room. Q. Who was present? A. Alex Greer. Q. How long was that before the suit was filed? A. If the suit had been filed, I didn't know it. Q. How long before the deed was made to you? A. I don't remember. Q. About two weeks before October 5, 1923? A. Several days before he tried to get him and he wouldn't buy it, and Mr. Handly said if I would buy subject to the mortgages, he would sell it. Q. Who was present at that time in the bank? A. I don't know. Nobody but Mr. Woestemeyer, Alex Greer and us in this little room. He cut me off short. I thought if he would take that I could get Tom Littlejohn to take the other. Q. Was that about two weeks before Mr. Handly made you the deed to the place? A. One week or ten days. Q. That would make it the middle of Sep-

tember? A. Somewhere around that. Before ever I bought it, I went there and tried to get him to buy it. Q. Did he tell you how much Handly owed the bank at that time? A. No, sir. Q. Didn't he tell you there were two notes? A. If he did, I have no recollection of it. Q. He might have mentioned it to you? A. It is possible that he mentioned it to me. He could have, I guess. Q. You wanted him to buy it and he wouldn't? A. No. He said he was in the banking business. Q. And what else— A. He didn't say anything more. Q. Then you went and bought the property, knowing that the debt to the bank had not been paid? A. Yes, sir. Q. How did you expect Mr. Handly to pay it? A. I don't know. I didn't know anything about the suit. Q. Didn't Mr. Woestemeyer tell you that Mr. Handly had been sued at that time? A. No, sir. If any suit was brought at that time I did not know it.''

Alex Greer, a witness for defendants, was asked if James A. Greer had a conversation with Mr. Woestemeyer, cashier of plaintiff bank, in July, 1923, in witness's presence, ''in which it was stated by Mr. Greer and insisted that he or the bank buy this Handly land and pay what was against it and make theirs out of what was over and above that, if there was anything to be made.'' Witness answered: ''Yes, we were in there and had such a conversation with Mr. Woestemeyer. Mr. Greer had the conversation and I was present.'' On cross-examination, witness testified: ''Q. And what was the occasion for you and Mr. Greer going into the bank? A. Wanted to see if Mr. Woestmeyer would buy this land. Q. The entire tract? A. The entire tract. Q. All of the Handly property? A. Yes, sir. Q. And Mr. Greer was negotiating and talking, wasn't he? A. Yes, sir. Q. He was talking for Mr. Ross Handly? A. I don't know who he was talking for, but he was the one that was doing the talking. Q. Well, Mr. Ross Handly owned the farm? A. I presume who it was then. . . . He [Greer] asked Mr. Woestemeyer if he would take the land, and Mr. Woestemeyer answered back that he wasn't in the land business, he was in the banking business. Q. What else was said? A. I think that was about all that was said considering the price of the land. He didn't ask any price on it or anything else. Mr. Woestemeyer didn't ask the price or anything, what he would take for it. Q. And just repeat again what Mr. Greer told him. A. He asked Mr. Woestemeyer if he would buy the land for the mortgages that was against it. Q. What else was said? A. I think that was about all. Q. Mr. Woestemeyer said he wasn't in the real estate business? A. He wasn't in the real estate business, he was in the banking business.''

Mr. Woestemeyer, cashier of plaintiff bank, testified: ''Q. Didn't Mr. Greer and Alex Greer come to your bank before this trade

was made and ask you to take this land for what was against it? A. No, sir. Q. Didn't they come to your bank and want you to buy it? A. Yes, sir. Q. Did you ask them the price of it at any time, or Ross Handly or Greer? A. I advised Mr. Handly to sell part of the land. Q. Did you ask the price on it? A. I asked the price on the 160 that he sold, without the improvements. Q. What was it? A. I am giving you hearsay again. Q. I don't call that hearsay, what he said. I am asking you what Handly said. What did he price it to you at? A. Mr. Handly never did price the whole farm to me, never did price it to me. He priced the 160 and then the home place, but he never did price the whole farm to me. Q. Did he price it in two tracts? A. $25,000 for each tract. Q. What did you ask him to take for the Littlejohn tract? A. $24,000. Q. Did he agree to take it? A. No, sir. Q. Did you think that was all the Littlejohn tract was worth, $24,000? A. I think it would be worth more. It's a very fine farm, but prices change on land. I couldn't say. He paid more. Q. Why did you ask him to take $24,000 if you thought it was worth more? A. When you can't get more, that settles it. I don't know that you can get that, but you can come down. . . . Q. Did you fix any price on the home place? A. Never. . . . Q. Now, you held this $7000 note, the bank did, due by William A. Greer, didn't you? A. Yes, sir. Q. And you insisted that they take this note up? A. Yes, sir. Q. And they did take it up? A. Yes, sir. Q. And paid you? A. Paid me, had it probated. Q. And they paid you? A. Yes, sir. Q. And this is the one note that's secured in the [third] deed of trust against this land? A. That's what I inferred from what Mr. Handly told me, yes, sir. . . . Q. Did you discuss the indebtedness that Mr. Handly owed the bank with Mr. Handly in the presence of James A. Greer, at the bank? A. Yes, sir, I did. Sometime in July, 1923. I told Mr. Handly that we would have to ask additional security on the payment of the notes. Q. Was Mr. Greer present in that conversation? A. Yes, sir. Q. Heard the conversation? A. Yes, sir. Q. What, if anything, did Mr. Handly say? A. Mr. Handly said that when the estate would be settled up I would be paid. Q. What estate did he have reference to? A. To the estate of his father-in-law, William A. Greer. Q. James A. Greer was present at that time? A. Yes, sir.''

Lee Handly, a brother of defendant Ross M. Handly, was called as a witness on behalf of plaintiff, and testified as follows: ''Q. Did you have any talk with Ross Handly along about July or August of 1923 about a mortgage that James A. Greer had on some of his property? (No answer.) Q. Did Ross Handly make a statement to you about a mortgage that James A. Greer had? A. Yes, sir.

Q. Tell the court what that statement was? A. I would rather not do that. By THE COURT: You will have to state it, if counsel insists on it. Plaintiff's COUNSEL: Yes, sir, we would like for him to state it. We realize he's a brother, but we would like to have him make the statement. Go ahead and tell the court. A. He said Mr. Greer had a mortgage on his corn so as to save it. By THE COURT: Said what? A. That Mr. Greer had a mortgage on his corn so that he could save it.'' Cross-examination: ''Q. You said something about him giving something, a mortgage. Did you say he gave Greer a mortgage? What was it you said he said? A. I said that he said that Mr. Greer had a mortgage on his corn. Q. Was that all he said? A. No. Q. What else did he say? A. Said so he could save it. Q. So who could save it? A. He didn't say. Q. Did he say he owed Greer? A. No, sir. Q. Did he say he didn't owe him? A. No, sir. Q. Didn't say anything about that? A. No, sir. Q. And you don't know whether he owed him or not? A. No, I don't.''

Ross Handly testified respecting the conversation had with his brother, Lee Handly, as follows: ''I had previously told him that I had given Jimmy Greer a mortgage on my property to secure a loan that I held from him and money advanced to pay interest on a mortgage of $25,000. Q. Did you tell your brother that you had given Mr. Greer a note and mortgage against your corn to save it? A. No, sir. By THE COURT: Or that he had taken it to save it? A. No, sir.''

Defendant, John T. Littlejohn, testified: ''Q. Mr. Littlejohn, if I understand you correctly, you had a number of conversations with Mr. Greer about buying this land? A. Well, we talked about it probably two or three times. Not so many times, though. Q. All those conversations were after Mr. Greer bought the land, you say? A. Yes, sir. Q. In any of those conversations did Mr. Greer ever tell you who he was trying to help in this matter? A. He said he wanted to save the estate—or something out of it. Q. Is that the reason he said he took this land over from Mr. Handly? A. He didn't say that was the reason, but he said he wanted to save them something. Q. Did he have reference to the estate or to Ross or the children? A. I think to the estate. Q. He might have meant Ross and the children? A. He might have meant that from what he said. He could have meant that, I reckon, but I took it that he wanted to save it for the estate. Q. Did he say how he was going to save it? A. No. Q. What did he mean, what was he trying to save for the estate? A. I don't know. I don't know how. Q. Well, what did he mean? A. I think, I rather think the estate had a third mortgage on this land. Q. $7000? A. Yes, I guess he

wanted to make it pay that out. That is the way I took it, anyway. . . . Q. What was said about saving Ross and his children something out of it? A. Mr. Greer said to me one day that he had to help those children some. . . . Q. Mr. Greer said that about Ross's children? A. Yes, sir. Q. How many did he have? A. I don't know, four or five. Q. That was after the deed was made to him by Ross? A. I rather think it was. Q. Said he had to help or save Ross's children something out of it? A. Said he had to help those children. Q. Did he mean out of the land or by taking the land? A. I don't know. I didn't ask him. It didn't concern me. Q. Was that a different conversation from what he said when he wanted to save the estate out of it? A. That was a different conversation. That was one evening he was at Warrensburg.''

Defendants Ross M. Handly and James A. Greer testified that the $6000 note and chattel mortgage, dated July 21, 1923, represented a pre-existing indebtedness of Handly owing to Greer upon a promissory note for $4000, with accrued interest thereon, and the interest payment of $1547.79 made by Greer on the $25,000 first deed of trust against the land in controversy. Handly's note for $4000 was payable to James A. Greer, and was cancelled and returned to Ross Handly at the time of the execution and delivery of the $6000 note and chattel mortgage. The $4000 note was put in evidence on the trial by defendants. Handly's explanation of the indebtedness represented by the $4000 note was that he had borrowed $100 or or $200 from his wife's uncle, James A. Greer, in 1910 or 1911, and that he had also borrowed various sums of money from his father-in-law, William A. Greer, and in July, 1921, William A. Greer had obtained from Handly his note for $4000, payable to James A. Greer, representing his indebtedness at that time owing to both William A. Greer and James A. Greer; that he had supposed he was borrowing the money from William A. Greer, but that William A. Greer had the note made payable to James A. Greer. The explanation of James A. Greer was that Ross Handly owed him (James A. Greer) about $100 or $150, and that William A. Greer owed James A. Greer the balance of the $4000, and that William A. Greer suggested that James A. Greer take Ross Handly's note for $4000 in evidence of both debts owing to James A. Greer; that William A. Greer and James A. Greer often traded together, and that sometimes William was indebted to James Greer, and at other times James was indebted to William Greer, and ''there would be a thousand dollars one way or the other sometimes.'' but that such indebtedness between the two Greer brothers had never been evidenced by promissory notes. No credits had been endorsed by James A. Greer on the $6000 note of Handly, dated July 21, 1923, al-

though sales had been made of certain of the live stock and crops covered by the chattel mortgage securing payment of said note. Ross Handly testified that he did not know "exactly" how much had been paid on the $6000 note, but that he had kept account of the sales made of the security, and that he "figured" he was entitled to credit on the note to the amount of $4117.97. James A. Greer testified that he made no credits on the back of the $6000 note, but that he had kept, in a blank memorandum book, an account of the sales of the security, as made, and that the $6000 note was entitled to a credit of about $3500.

The evidence shows that the actual and aggregate consideration paid by defendant James A. Greer, for the two farms in controversy, (by assuming and paying the principal mortgage indebtedness, with interest and taxes against the same) was, as follows:

Principal of first deed of trust ..................$25,000.00
Interest paid on same to March 4, 1923 ..............  1,547.79
Interest on same from March 4 to October 4, 1923 .....    875.00
Principal of second deed of trust, note owned by
   Littlejohn ....................................  8,000.00
Interest accrued on said $8000 note ..................    686.00
Principal of second deed of trust, note owned by Thee ..  2,000.00
Interest accrued on said $2000 note ..................     64.00
Third deed of trust, securing debt due William A.
   Greer estate ..................................  7,000.00
Taxes paid on land in controversy for year 1923 ....    253.32
                                   ———————

Total consideration paid for the two farm tracts ....$45,426.11
Consideration paid by Littlejohn for 159½-acre tract ..$23,150.00
Actual consideration paid by Greer for home-place
   tract .........................................$22,276.11

Of the total consideration of $23,150 paid by Littlejohn for the 159½ acre tract, $8686 is represented by the cancelled principal note, and accrued interest, owned by Littlejohn, secured by second deed of trust on the two farm tracts, and the balance of $14,464 was paid by Littlejohn in cash.

The evidence tends to show that the year 1923 marked a general deflation in the value of farm lands; that sales of farm lands in the community were stagnant and practically at "a stand-still," and that generally there were no sales or transfers of farm lands, except, perhaps, under foreclosure of mortgages. Several farm-owners in the community testified on behalf of plaintiff that the reasonable market value of the home place of approximately 166.18 acres, including the improvements thereon, in the year 1923, was from $170 to $200 per acre, and the same witnesses expressed the opinion that the reasonable

value of the improvements thereon was from $8000 to $10,000. Witnesses for defendants estimated the value of the home place, including the improvements thereon, in 1923, to be from $100 to $125 per acre, and that the value of the improvements thereon was about $6000. Defendant Ross M. Handly testified that the original aggregate cost of the improvements, which had been placed on the home place some ten years, or more, prior to 1923, was about $4855. Plaintiff's witnesses estimated the reasonable market value of the 159½ acre tract sold by Greer to Littlejohn (upon which tract there were no improvements) to be from $145 to $150 per acre in 1923, while defendants' witnesses estimated such value to be from $115 to $130 per acre. The several witnesses testified that the Littlejohn tract was the better land, and a greater part thereof was capable of cultivation than the home-place tract. The testimony of all the witnesses respecting the market value of the two tracts was based wholly upon opinion, rather than upon any actual, or recorded, sales of farm lands in the community during the year 1923. Based upon the considerations above stated, defendant James A. Greer paid approximately $134 an acre for the home place tract of 166.18 acres, with the improvements thereon, and defendant Littlejohn paid $145 an acre for the 159½ acre tract, which was unimproved. The unimproved tract purchased by Littlejohn immediately adjoins a 320 acre farm which he then owned, which was an inducement to Littlejohn to buy the tract at a higher price ($145 an acre) than he might have offered had said tract not been contiguous to his 320 acre farm. The farms in question are located about ten miles south of the city of Higginsville, in Lafayette County.

Defendant John T. Littlejohn was a director of plaintiff bank during all the times in question, and he testified that, while he knew that Ross M. Handly was indebted to plaintiff bank and that the board of directors had directed that suit be brought by the bank to recover said indebtedness from Handly, yet he did not know the aggregate amount of Handly's indebtedness to the bank and did not have any suspicion at the time that the sale of the two farm-tracts by Handly to Greer was fraudulent. The evidence tends to show that defendant Connecticut Mutual Life Insurance Company made a loan of $9000 to Greer upon the security of the home-place tract of 166.18 acres, after causing an examination of the title to be made by a local examiner of titles, and also by its home office, and that said defendant had no actual knowledge of Handly's indebtedness to the plaintiff bank, or of any claim of plaintiff in the land. After the sale of the lands in question to James A. Greer, the defendant Ross M. Handly remained in possession of the home-place

tract, as the tenant of Greer, under annual and written farm leases between Greer, as landlord, and Handly, as tenant.

I. It is insisted by appellant (plaintiff) that the evidence herein does not support the findings and judgment of the learned trial chancellor; that the chancellor erred in dismissing the plaintiff's bill as being without equity, and in entering judgment in favor of all the defendants, for the reason that, under both the applicable law and the evidence, the findings and judgment of the chancellor below should have been in favor of the plaintiff. The respondents (defendants) meet the contention and insistence of appellant by urging that this is an action in equity, in which the testimony is conflicting, and wherein the trial chancellor heard the testimony of the respective parties, and of their several witnesses, fall orally from their lips, and saw their demeanor and manner of testifying while on the witness stand, wherefore due deference must be given by this court to the findings and judgment of the trial chancellor. It is true that, in equity causes, where the testimony is conflicting and rather evenly balanced, and there is substantial evidence upon which to predicate the findings and judgment of the trial chancellor, we are disposed to defer somewhat to the chancellor's findings, but as was pointedly said by Judge SHERWOOD, in Benne v. Schnecko, 100 Mo. 250, 258, after remarking on our customary rule of practice: "But by such remarks we are not to be understood as meaning that we are concluded by the finding of facts by the court below; far from it. Such remarks do not mean that we have abdicated our supervisory control over questions of fact in equity causes; they only mean that when there is conflict of testimony, or where the testimony is evenly balanced and the finding of the chancellor appears to be correct, then we will so far defer to his finding as to sanction it by our affirmance; 'that and nothing more.' "

We are mindful that, in equity causes, where fraud in fact, as distinguished from constructive fraud, is alleged in the bill, the burden is cast upon the plaintiff, as in other causes, to prove and establish the fraud alleged; and that fraud in fact is never to be presumed, but, on the other hand, if the facts and circumstances in evidence are consistent with an honest purpose, honesty in the transaction under review should be inferred. But we are likewise mindful, as we have often said, that "fraud is never proclaimed from the house tops, nor are fraudulent intentions reduced to writing and given to the public press. Fraudulent intents and fraudulent acts have their birth and origin in darkness, and are fathered by a desire to wrong. Ofttimes the parties attempt to dress

them with the adornments of honesty, but beneath it all will be found unconscious blazings which will mark the real pathway followed by the parties." [St. Francis Mill Co. v. Sugg, 206 Mo. 148, 155; Massey v. Young, 73 Mo. 260, 273.] Inasmuch, therefore, as "fraud is rarely ever susceptible of positive proof," we have ruled, in the cases above cited (thereby announcing a rule of practice for our own guidance), that "it is legitimate to infer its existence from surrounding circumstances pointing unmistakably to a wrongful purpose." And so we aptly said, in St. Francis Mill Co. v. Sugg, supra (206 Mo. 1. c. 157): "Parties do not usually enter into a scheme to hinder, delay or defraud creditors, and later when called into court to explain their transaction, openly admit the facts. Such has not been the experience of either the bench or bar. So that, after all, in these cases we are forced to take the facts and circumstances as they appear, and from them undertake to draw rational and reasonable inferences and conclusions. When we have done that, we have met the full measure in cases involving the question of fraud."

The determinative question in the instant case, to our minds, is wholly one of fact, for the controlling and applicable law of the case is well settled by the decisions of this court. In fact, the respective parties, in their briefs herein, apparently concede the law (as heretofore announced by this court) to be that, if the purpose of defendant Ross Handly, in conveying the land in controversy to James A. Greer, was to put it out of reach of the plaintiff bank in anticipation of the execution that would in course follow the judgment he apprehended the bank would recover in the suit then pending upon his unsecured promissory notes held and owned by the bank, then it was a fraudulent transaction on the part of Handly, the seller; and if the defendant, James A. Greer, the ostensible buyer, made the purchase of the land and took the conveyance with knowledge of the fraudulent purpose on the part of the seller and with the intent to assist him in the accomplishment of such purpose, then it was a fraudulent transaction on the part of both said defendants, and the sale should be set aside as to the plaintiff bank, unless the rights of subsequent and innocent purchasers of the land have intervened. [Gust v. Hoppe, 201 Mo. 293; Barber v. Nunn, 275 Mo. 565; St. Francis Mill Co. v. Sugg, 206 Mo. 148; Dougherty v. Cooper, 77 Mo. 528; Frederick v. Allgaier, 88 Mo. 601; Bishop v. Bishop (Mo. Sup.), 228 S. W. 1065, and cases there cited.]

The evidence is quite conclusive that Ross M. Handly was rendered insolvent immediately upon making the conveyance of the land in controversy to James A. Greer on October 5, 1923, if, in

fact, he was not insolvent before the making of that conveyance. Ross Handly openly admits that fact in his own testimony, for he stated that he had neither real nor personal property out of which an execution could be collected, and, while he admitted his indebtedness to plaintiff bank, he testified that he had nothing to pay it with. Defendant James A. Greer, in his deposition taken herein, admitted that he knew, at the time he took the deed from Ross Handly, that Handly owed the plaintiff bank $3000 or $4000, and when Greer was asked if he knew, when Handly deeded to him the land, "that Handly would not have a dollar left," he answered, "I didn't see where he would." On July 21, 1923, several months prior to the conveyance, by Handly to Greer, of the land in question, Greer had taken a chattel mortgage upon substantially all of the personal property owned by Handly, together with the growing and unharvested crops upon the land. It is, therefore, reasonable to infer and believe that Greer must have known, at the time of the conveyance of the land, that Handly had thereby stripped himself of every vestige of property and possessions, both personal and real. Suit was commenced by the plaintiff bank against Ross Handly in the Circuit Court of Lafayette County on September 13, 1923, to recover Handly's unsecured indebtedness to the bank. The testimony is somewhat conflicting respecting Greer's knowledge of the commencement and pendency of that suit. Handly testified in his deposition that the petition in the suit had been served upon him prior to the making of the conveyance of the land; that he had delivered the petition which had been served upon him to his attorney, who was also Greer's attorney, and who was the notary public who took the acknowledgment of Handly and his wife to the deed of conveyance of the land; and that both the attorney and James A. Greer knew of the commencement and pendency of the suit at the time the deed was made and delivered. Defendant Greer testified that, while he knew that Handly was indebted to the bank, yet he did not know the amount of the indebtedness, and did not know about the pending suit, although the attorney aforesaid had supposedly searched the public records before Greer accepted delivery of the deed of conveyance. But even upon defendants' own theory, the evidence is well nigh conclusive that James A. Greer knew all about Handly's indebtedness, not only to the bank, but to other creditors, as well. Handly testified that he told Greer, before the deed was made, about owing the several notes to the bank, and that Greer knew "just about" his financial condition in August, 1923, when Greer advanced the money to pay the interest due upon the $25,000 encumbrance against the land. Greer testified quite positively that he had gone to the cashier of the plaintiff bank, some time in July or August, 1923, before the

making and delivery of the deed of conveyance, and had proposed that the bank take over the land for the amount of the existing encumbrances against it, and make Handly's indebtedness to the bank, if possible, out of the balance of the value of the land. So it is reasonable to infer and believe that Greer knew, at the time of such proposal to the bank, that Handly was indebted in some considerable sum, at least, to the bank. Otherwise, why Greer's proposal to the bank? Furthermore, it seems to be quite clear from the evidence that Ross Handly conceived the idea of deeding the land, in consideration of the assumption by the buyer of the existing encumbrances thereon, about the time when the bank insisted upon payment of his indebtedness to the bank. Prior to that time, he seems only to have sought some way to borrow the money to pay the annual interest of $1500 due upon the $25,000 encumbrance against the land. In other words, it seems to be reasonably clear from the evidence that Handly conceived the idea of conveying the land for the consideration of the assumption of the encumbrances against it only after the bank became insistent upon, and began to press him for, the payment of his indebtedness, or for security against his indebtedness, and that Handly did not actually carry out the idea until after the bank had commenced a suit against him to recover such indebtedness, and then Handly realized no ready cash, or pecuniary benefit whatsoever, as a result of the conveyance of the land. The logical and reasonable inference to be drawn therefrom, we think, is that the purpose and intent of Handly in making the conveyance of the land in consideration only of the assumption by the buyer of the existing encumbrances thereon was either to evade the payment of his indebtedness to the bank, or to hinder and delay the bank in the collection of its lawful demands, either of which purposes made the transaction fraudulent on the part of defendant, Handly. It is likewise reasonable to infer and believe, we think, from all the facts and circumstances in evidence, that defendant James A. Greer had actual knowledge of, and participated in, the fraudulent intent and purpose of Ross Handly. Littlejohn testified that James A. Greer told him, after the conveyance of the land from Handly to Greer had been made, that he (Greer) wanted to save the William A. Greer estate something, and that, on another occasion, Greer said he wanted to help Ross's children. Littlejohn is a co-defendant herein of both Greer and Handly, and there seemingly was no reason or inducement for him to testify falsely concerning the admissions or statements made to him by Greer. The evidence tends to show that James A. Greer was not an heir of William A. Greer, and there is no showing in the record that he participated, either directly or indirectly, as a beneficiary in the distribution of the William. A.

784

Greer estate. However laudable may have been the purpose of James A. Greer in seeking to save the William A. Greer estate something, or in seeking to help Ross Handly's children, as the result of a fraudulent transaction, such purpose does not remove the fraud, participated in by both Handly and Greer, or render the transaction between them any the less fraudulent as respects the rights and demands of the creditor bank.

But respondents urge that James A. Greer was an unsecured creditor of Ross Handly, and that James A. Greer did not purchase the land for a fresh consideration, but solely for the purpose of liquidating, or of securing payment of, Handly's pre-existing debt to Greer, and, therefore, that Handly had the lawful right, under the decisions of this court, to liquidate, or to secure payment of, his debt to Greer, although the effect of such transaction may have been to prefer Greer as a creditor, provided the sale and conveyance of the land was made upon the basis of the fair and reasonable market value of the land. It is true that we have said, in Kincaid v. Irvine, 140 Mo. 615, 623, that *"so long as there is no fraud in the transaction,* a debtor in failing circumstances may prefer his kinsman who is his creditor as well as a stranger; and, while a court of equity will scan the transaction with jealous eyes, preference and relationship alone will not afford sufficient evidence of fraud." But the evidence herein points to the fact that James A. Greer was not an unsecured creditor of Handly, in the usual and ordinary meaning and acceptation of that term, at the time he took the conveyance of the land from Handly. On July 21, 1923, Handly had given to Greer a chattel mortgage upon all of his personal property, and also upon his growing crops, to secure the payment of a claimed indebtedness of $4000 and interest then owing by Handly to Greer, and also to secure the payment of $1547.79 advanced by Greer as payment of the accrued interest upon the first mortgage indebtedness against the land, aggregating in all $6000. Plaintiff claims that the $4000 debt of Handly to Greer was fictitious, and the testimony of Handly and Greer respecting the nature of said $4000 indebtedness is not very enlightening, to say the least. But be that as it may, and assuming that Handly's $4000 note to Greer evidenced a bona-fide indebtedness of Handly to Greer, nevertheless the chattel mortgage given to Greer by Handly on July 21, 1923, appears from the evidence to have been ample security for the payment of Handly's total indebtedness of $6000. Both Handly and Greer testified that sales made of the chattel mortgage security had netted around $3500 or $4000, which amount had never been credited upon the $6000 note, so that there remains unpaid only about $2000 on Handly's claimed indebtedness of $6000, secured by the chattel

mortgage of July 21, 1923. Whether all of the chattel mortgage security had been sold, or not, is not made clear by the record before us. There is no evidence in the record that the holders of the several deeds of trust against the land were harassing Handly, or threatening foreclosure, after the interest due March 4, 1923, on the first mortgage indebtedness of $25,000, had been paid. While Greer claims to have acquired and purchased the first mortgage notes, aggregating $25,000, in August, 1923, it is evident that those notes were amply secured by the superior deed of trust on the land. It is clear to our minds that Greer stood in no danger whatsoever of losing any part of Handly's debt to him had the conveyance of October 5, 1923, never been made by Handly. The testimony respecting the reasonable value of the two tracts of land in question, in the year 1923, is widely conflicting, and appears to be based largely, if not entirely, upon the mere opinion of witnesses, for no actual sales of land in the community appear to have been made during that year. Littlejohn testified that the home-place tract, which was retained by Greer, with the improvements thereon, was worth as much, or more, as the 159½ acre tract purchased by Littlejohn from Greer. But even though the assumption of the payment of the existing encumbrances against the land in controversy was an adequate and fair consideration for the conveyance of said land, if the defendant James A. Greer had no existing interest to preserve or protect, but purchased for a fresh consideration, he is not protected in such purchase if he knew that Handly, the seller, was selling and conveying for the purpose of putting his property out of the reach of execution. [Gust v. Hoppe, 201 Mo. 293, 300; Barber v. Nunn, 275 Mo. 565, 572.] To our minds, the facts and circumstances in evidence point strongly and certainly to the fact that the sale and conveyance of the land in controversy, by defendant Ross M. Handly to defendant James A. Greer, was the outgrowth of an understanding or agreement between said defendants to put the land beyond the reach of plaintiff, the creditor bank, at that time.

We see no merit in the defense, pleaded by defendants Handly and Greer in their answer, that the sale and conveyance of the land was made after Greer and Handly had offered the land to plaintiff bank for the same amount and consideration, with the proposal that, if the land be worth more, the bank might collect its demand therefrom. We know of no reason, legal or equitable, why the bank was required to take the land at that time and assume the payment of a mortgage indebtedness thereon of $42,000, and accrued interest, merely because the bank was an unsecured creditor of Handly.

We are of opinion that the learned trial chancellor erred in his findings and judgment upon the facts and circumstances in evidence, and have reached the conclusion that the judgment *nisi* must be reversed as to the defendants Handly and Greer.

II. As to the defendants Littlejohn, there is no conclusive or convincing evidence that either John T. Littlejohn, or his wife, Mary L. Littlejohn, had knowledge of the fraudulent nature of the transaction between Handly and Greer, or that they knowingly assisted in the perpetration of a fraud. It is true that John T. Littlejohn was a director of plaintiff bank, and that, as such director, he knew that Handly was indebted to the bank. He testified that, while he knew that Handly was indebted to the bank, he did not know the amount of such indebtedness; and he testified further that he had no conversation or dealings with Greer respecting the purchase of the 159½ acre tract until after the land in controversy had been conveyed to Greer by Handly. The consideration of the sale of the 159½ acre tract to defendants Littlejohn was upon the basis of $145 per acre, aggregating $23,150, of which consideration $14,464 was paid by Littlejohn in cash and was applied toward the payment and satisfaction of the $25,000 first mortgage against the land in question, and the balance of $8686 represented the principal note, and accrued interest thereon, owned and held by Littlejohn and secured by a second deed of trust on the land in question, which deed of trust was satisfied of record concurrently with the delivery of the deed of conveyance from Greer to Littlejohn. The weight of the evidence was that $145 an acre was the then reasonable market value of the 159½ acre tract, if, in fact, such price did not exceed somewhat the then value of that tract. We believe that there is substantial evidence, to say the least, upon which to predicate the findings and judgment of the trial chancellor as to the defendants Littlejohn.

As to the defendants Johnson and Connecticut Mutual Life Insurance Company, the evidence clearly shows that those defendants had no actual knowledge of Handly's indebtedness to the bank, or of any claim of plaintiff bank in the land. The loan of $9000 was made by the defendant Connecticut Mutual Life Insurance Company in apparent good faith and upon the security of the home-place tract of 166.18 acres, the record title to which tract was then in James A. Greer. This cause being one in equity, we will direct a judgment in conformity with our views of the equities of the case, and one which will in no wise disturb the titles or equities of innocent purchasers and encumbrancers. [St. Francis Mill Co. v. Sugg, 206 Mo. 148, 171.]

III. It is urged, however, by defendants Handly and Greer that the home-place tract of 166.18 acres, more or less, situate in Section 18, Township 48, Range 25, constituted the homestead of Handly, and that the statute makes such homestead exempt from attachment and execution; wherefore, the plaintiff bank, and other creditors of Handly as well, will not be heard to complain of any sale or conveyance of such homestead, even though the effect and purpose of such sale or conveyance be in fraud of such creditors.

The statute (Sec. 5853, R. S. 1919) provides that "the homestead of every housekeeper or head of a family, consisting of a dwelling house and appurtenances, and the land used in connection therewith, not exceeding the amount and value herein limited, . . . shall, together with the rents, issues and products thereof, be exempt from attachment and execution, except as herein provided; such homestead in the country shall not include more than one hundred and sixty acres of land, or exceed the total value of fifteen hundred dollars; . . . nothing herein contained shall be so construed as to prevent the husband and wife from jointly conveying, mortgaging, alienating or in any other manner disposing of such homestead, or any part thereof."

It has been repeatedly held by this court and by the courts of appeals, as contended by said defendants, that the conveyance of a statutory homestead by the owner thereof is not fraudulent as to creditors of the owner of the homestead, since such homestead is exempt from execution under the statute, and hence such creditors have no legal right to complain of the disposition, sale or conveyance thereof. [Pocoke v. Peterson, 256 Mo. 501; Armor v. Lewis, 252 Mo. 568; Stam v. Smith, 183 Mo. 464; Rose v. Smith, 167 Mo. 81; Creech v. Childers, 156 Mo. 338; Macke v. Byrd, 131 Mo. 682; Bank v. Guthrey, 127 Mo. 189; Claywell v. Spradling (St. L. C. A.), 255 S. W. 960.] In determining the value of the homestead, it has also been ruled that the amount of the existing mortgage encumbrances thereon must first be deducted from the value of the land, and the homestead assigned in the equity of redemption; and the statute so provides. [Sec. 5855, R. S. 1919; Houf v. Brown, 171 Mo. 207; Claywell v. Spradling, 255 S. W. 960.]

The record herein discloses that defendant James A. Greer, on August 4, 1923, voluntarily paid the interest, amounting to $625, upon the $25,000 first mortgage indebtedness (computed for the five-month period between March 4 and August 4, 1923), and that, on November 1, 1923, he paid the taxes assessed for the year 1923 against the two tracts of land conveyed on October 5, 1923, to James A. Greer by the defendants Handly. So it is furthermore urged by de-

fendant James A. Greer, that he is entitled to reimbursement for the interest and taxes aforesaid voluntarily paid by him. In disposing of a like contention, we held, in Implement Co. v. Jones, 143 Mo. 253, 281, that the doctrine of subrogation, or of reimbursement, cannot be invoked by one holding title as grantee under a deed or mortgage made in fraud of creditors of the grantor in the deed. And so in Bank v. Fry, 216 Mo. 24, 35, we quoted with approval the following from Kuykendall v. McDonald, 15 Mo. l. c. 420: "When a creditor, by fraud, will attempt to defeat the claims of other creditors, there is no hardship in postponing his demand, although a just one, to those which he has endeavored to defeat." In 27 Corpus Juris, 673, the established rule is thus stated: "Where the conveyance is founded in actual fraud, the grantee as a general rule is regarded as a *particeps criminis,* and is not entitled to reimbursement or to have the conveyance stand for any purpose of reimbursement or indemnity, either for the consideration or for advances paid." The foregoing announcement of the text-writer is amply supported by the judicial authorities of this and other states, cited in the text.

It appears from the evidence herein that the principal and the unpaid accrued interest of the general mortgage indebtedness represented and secured by the three deeds of trust against the entire real property conveyed by Handly and his wife to defendant James A. Greer (which real property included the home place of 166.18 acres, more or less, and also the 159½ acre tract of land afterward sold and conveyed by James A. Greer to defendants Littlejohn), amounted, in the aggregate, to the sum of $42,954 on October 5, 1923, the date of the fraudulent conveyance from Handly and wife to Greer, which said sum of $42,954 constituted the purported consideration for said fraudulent conveyance from Handly and wife to James A. Greer. It also appears from the evidence herein that the entire consideration of $23,150 paid by defendants Littlejohn, for the conveyance of the 159½ acre tract sold to them by James A. Greer, was actually used and applied toward the payment and reduction of the general mortgage indebtedness of $42,954 existing on October 5, 1923, against both the home place tract of 166.18 acres and the 159½ acre tract sold by Greer to the defendants Littlejohn. Deducting $23,150 from the aggregate general mortgage indebtedness of $42,954, there remains the sum of $19,804, which latter sum may be fairly and equitably assumed and taken to represent the amount of the mortgage encumbrances existing on October 5, 1923, apportionable to and against the home-place tract of 166.18 acres, situate in Section 18, Township 48, Range 25, which latter tract constituted the homestead of Handly. We make the assumption just stated for the reason that, if the consideration ($23,150) paid to

Greer by Littlejohn for the sale and conveyance of the 159½ acre tract of land exceeded the proportionate share or part of the general mortgage indebtedness ($42,954) apportionable to said tract of 159½ acres sold to Littlejohn by Greer, then such excess, equitably speaking, should be applied in reduction of the general mortgage indebtedness apportionable to the home place tract of 166.18 acres; otherwise, Greer, as a participant in the fraudulent transaction and conveyance of both tracts between himself and Handly, would be permitted and allowed to profit (to the injury of plaintiff bank) by the sale of the 159½ acre tract to Littlejohn. In other words, an active participant in a fraudulent conveyance should never be permitted to profit thereby to the injury of a defrauded creditor, whether by subsequent sale of the entire property fraudulently conveyed, or by subsequent sale of only a part of the property fraudulently conveyed. This equitable rule and principle is so plain, we think, as to require no citation of juristic authorities in support thereof. Inasmuch as the statute (Sec. 5855, R. S. 1919) requires that, in ascertaining and determining whether the value of the homestead (on October 5, 1923) in the home-place tract exceeds $1500 (the maximum statutory homestead value), the amount of the mortgage encumbrances thereon (on October 5, 1923) must first be deducted from the value of the home-place tract, it follows, therefore, that, as the basis of such determination, the amount of $1500 (the maximum statutory homestead value) must be added to $19,804 (the amount of the mortgage encumbrances existing on October 5, 1923, apportionable against the home-place tract), making an aggregate amount of $21,304, which latter amount represents the statutory homestead exemption of defendants Handly, in the home-place tract of 166.18 acres, plus the amount of the mortgage encumbrances thereon existing on October 5, 1923. It also appears from the record that the home-place tract exceeds in area, by some six or more acres, the 160 acres fixed by the statute as the maximum area of a homestead in the country. In order, therefore, to determine whether the value of the home-place tract on October 5, 1923, exceeded Handly's $1500 statutory homestead exemption therein, plus the amount of the mortgage encumbrances thereon (which addition amounts to $21,304), necessarily the reasonable and fair value of the entire home-place tract of 166.18 acres, more or less, on October 5, 1923, must be ascertained and determined by the circuit court, and, if such value cannot be ascertained and determined by the circuit court from the evidence which was adduced on the original trial of the action, then the circuit court shall receive and hear additional and further evidence bearing thereon. If the value (so ascertained and determined by the circuit court) of the entire home-place tract of 166.18 acres,

more or less, situate in Section 18, Township 48, Range 25, in La-
fayette County, on October 5, 1923, exceeds the sum of $21,304, then
the plaintiff herein shall be adjudged to have a lien, for the amount
of the unpaid judgments and demands of plaintiff bank against the
defendants Handly, upon and against said separate and entire (home-
place) tract of land, which lien, however, shall be subject and in-
ferior to the lien of the present deed of trust of record, dated No-
vember 8, 1923, securing payment of the promissory note of James A.
Greer for the principal sum of $9000, payable to the Connecticut
Mutual Life Insurance Company five years after November 8, 1923,
together with any unpaid and accrued interest on said principal
sum, and which lien shall also be subject and inferior to a lien in
favor of said James A. Greer in the sum of $1500, which latter
sum is the statutory maximum value of the homestead conveyed to
said James A. Greer by defendants Handly; and it shall further
be adjudged, ordered and decreed by said circuit court that the
whole of said home-place tract of land, situate in Section 18, Town-
ship 48, Range 25, in Lafayette County, together with all the right,
title and interest therein of the defendants Ross M. Handly, Myra
E. Handly and James A. Greer, and each of them, and of their re-
spective heirs, devisees, grantees and assigns, be sold for the pay-
ment and satisfaction of plaintiff's said lien, subject, however, to the
said present encumbrance and deed of trust, and the lien thereof,
in favor of the Connecticut Mutual Life Insurance Company, and
subject also to said lien in the sum of $1500 in favor of said James
A. Greer. If, on the other hand, the reasonable and fair value of
the said home-place tract of 166.18 acres, more or less, on October 5,
1923, as so ascertained and determined by the circuit court, does
not exceed the sum of $21,304, but, nevertheless, there being an excess
in area of said tract over and above the statutory maximum home-
stead area of 160 acres, the circuit court, in that event, shall allow
and permit the said James A. Greer to file in said circuit court his
irrevocable written designation and selection of the 160 acres, de-
scribed by metes and bounds in an integral body, selected by him as
the statutory homestead conveyed by defendants Handly to said
James A. Greer; or, in the event of the refusal or failure of said
James A. Greer to file such written designation and selection, then
the said circuit court shall appoint three disinterested commissioners
to set out and fix the location and boundaries of said 160 acres, in
an integral body, and to make report of their doings and action
to the said circuit court, subject to the confirmation and approval
of said circuit court, and the excess in area of said home-place tract
over and above said 160 acres shall then be sold for the purpose of
applying the net proceeds of such sale upon, and in reduction of,

plaintiff's said lien, claims and demands, subject, however, to the said present encumbrance and deed of trust, and the lien thereof, in favor of the Connecticut Mutual Life Insurance Company.

The judgment *nisi*, therefore, will be reversed and the cause will be remanded to the circuit court for further proceedings in accordance with the views and directions herein expressed, and with directions also to enter judgment in favor of the defendants, John T. Littlejohn and Mary Lillian Littlejohn, ordering dismissal of the action against said last named defendants. It is so ordered.

*Lindsay* and *Ellison*, *CC.*, concur.

PER CURIAM:—The foregoing opinion of SEDDON, C., is adopted as the opinion of the court. All of the judges concur.